UNITED STATES of America,

v.

Usama BIN LADEN, a/k/a "Usamah Bin–Muhammad Bin–Ladin," a/k/a "Shaykh Usamah Bin–Ladin," a/k/a "Abu Abdullah," a/k/a "Mujahid Shaykh," a/k/a "Hajj," a/k/a "al Qaqa," a/k/a "the Director," a/k/a "the Supervisor," Muhammad Atef, a/k/a "Abu Hafs," a/k/a "Abu Hafs el Masry," a/k/a "Abu Hafs el Masry el Khabir," a/k/a "Taysir," a/k/a "Sheikh Taysir Abdullah," a/k/a "Abu Fatimah," Ayman Al Zawahiri, a/k/a "Abdel Muaz," a/k/a "Dr. Ayman al Zawahiri," a/k/a "the Doctor," Mamdouh Mahmud Salim, a/k/a "Abu Hajer al Iraqi," a/k/a "Abu Hajer," Khaled Al Fawwaz, a/k/a "Khaled Abdul Rahman Hamad al Fawwaz" a/k/a "Abu Omar," a/k/a "Hamad," Ali Mohamed, a/k/a "Ali Abdelseoud Mohamed," a/k/a "Abu Omar," a/k/a "Omar," a/k/a "Haydara," a/k/a "Taymour Ali Nasser," a/k/a "Ahmed Bahaa Eldin Mohamed Adam," Wadih El Hage, a/k/a "Abdus Sabbur," a/k/a "Abd al Sabbur," a/k/a "Wadia," a/k/a "Abu Abdullah al Lubnani," a/k/a "Norman," a/k/a "Wa'da Norman," Fazul Abdullah Mohammed, a/k/a "Harun," a/k/a "Harun Fazhl," a/k/a "Fazhl Abdullah," a/k/a "Fazhl Khan," Mohamed Sadeek Odeh, a/k/a "Abu Moath," a/k/a "Noureldine," a/k/a "Marwan," a/k/a "Hydar," a/k/a "Abdullbast Awadah," a/k/a "Abdulbasit Awadh Mbarak Assayid," Mohamed Rashed Daoud Al–'Owhali, a/k/a "Khalid Salim Saleh Bin Rashed," a/k/a "Moath," a/k/a "Abdul Jabbar Ali Abdel–Latif," Mustafa Mohamed Fadhil, a/k/a "Mustafa Ali Elbishy," a/k/a "Hussein," a/k/a "Hussein Ali," Khalfan Khamis Mohamed, a/k/a "Khalfan Khamis," Ahmed Khalfan Ghailani, a/k/a "Fupi," a/k/a "Abubakary Khalfan Ahmed Ghailani," a/k/a "Abubakar Khalfan Ahmed," Fahid Mohammed Ally Msalam, a/k/a "Fahad M. Ally," Sheikh Ahmed Salim Swedan, a/k/a "Sheikh Bahamadi," a/k/a "Ahmed Ally," Defendants.

No. S6 98 CR. 1023 LBS.

United States District Court, S.D. New York.

March 13, 2000.

Mary Jo White, New York City, Kenneth Karas, Patrick Fitzgerald, Michael J. Garcia, Paul Butler, Assistant United States Attorneys, for the Southern District of New York.

Paul McAllister, Charles D. Adler, George Goltzer, New York City, for defendant Salim.

James Roth, Lloyd Epstein, New York City, for defendant Mohamed.

Samuel Schmidt, Joshua Dratel, Deborah I. Meyer, New York City, for defendant El Hage.

Michael Young, Carl J. Herman, Sandra L. Babcock, New York City, for defendant Odeh.

Leonard Joy, Robert Tucker, Mark Gombiner, David Bruck, New York City, for defendant Al-'Owhali.

Jeremy Schneider, David Stern, David Ruhnke, New York City, for defendant Khamis Mohamed.

## OPINION

SAND, District Judge.

### Opinion as to Jurisdiction[1]

The sixth superseding indictment in this case ("the Indictment") charges fifteen defendants with conspiracy to murder United States nationals, to use weapons of mass destruction against United States nationals, to destroy United States buildings and property, and to destroy United States defense utilities. The Indictment also charges defendants Mohamed Sadeek Odeh, Mohamed Rashed Daoud al-'Owhali, and Khalfan Khamis Mohamed, among others, with numerous crimes in connection with the August 1998 bombings of the United States Embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania, including 223 counts of murder. The Indictment also charges defendant Wadih el Hage with numerous perjury and false statement counts. Six of the Defendants are presently in the custody of the Bureau of Prisons: Mamdouh Mahmud Salim, Ali Mohamed, Wadih El Hage, Mohamed

Rashed Daoud Al-Owhali, Khalfan Khamis Mohamed, and Mohamed Sadeek Odeh ("Odeh"). Presently before the Court is Odeh's Motion to Dismiss Counts 5–244 for Lack of Jurisdiction, in which the other defendants join. For the reasons given below, we grant Odeh's Motion as to Counts 234, 235, 240, and 241, but deny it as to Counts 5–233, 236–239, and 242–244.

### Discussion

Odeh argues that most of the counts charged in the Indictment must be dismissed by this Court because they are based on statutes that are inapplicable to the acts he is alleged to have performed. In support of this position, Odeh advances six arguments, which we address *seriatim.*

### I. Extraterritorial Application

Odeh argues that Counts 5–8, 11–237, and 240–244 must be dismissed because (a) they concern acts allegedly performed by Odeh and his co-defendants outside United States territory, yet (b) are based on statutes that were not intended by Congress to regulate conduct outside United States territory. More specifically, Odeh argues that "the following statutes that form the basis for the indictment fail clearly and unequivocally to regulate the conduct of foreign nationals for conduct outside the territorial boundaries of the United States: (1) 18 U.S.C. § 930; (2) 18 U.S.C. § 844; 18 U.S.C. § 1111; 18 U.S.C. § 2155; 18 U.S.C. § 1114; [18 U.S.C. § 924(c);] and 18 U.S.C. § 114." Odeh's Memo. at 7. Whether Congress intended several of these provisions (viz., Sections 844(f), (h), and (n); 930(c), and 2155) to apply extraterritorially present issues of first impression.[2]

---

1. This opinion deals solely with defendants' claims that the Court lacks jurisdiction. Other matters raised in defendants' pending motions will be dealt with in succeeding opinions.

2. Indeed, only one case, *United States v. Erdos,* 474 F.2d 157 (4th Cir.), *cert. denied,* 414 U.S. 876, 94 S.Ct. 42, 38 L.Ed.2d 122 (1973), has concluded, in effect, that Sections 114 and 1111 apply extraterritorially to the con-

duct of United States citizens. Similarly, only one case, *United States v. Benitez,* 741 F.2d 1312 (11th Cir.1984), *cert. denied,* 471 U.S. 1137, 105 S.Ct. 2679, 86 L.Ed.2d 698 (1985), has held that Section 1114 applies to the extraterritorial conduct of foreign nationals; and only one case, *United States v. Yousef,* 927 F.Supp. 673 (S.D.N.Y.1996), has held that Section 924(c) applies to the extraterritorial conduct of foreign nationals.

## A. General Principles of Extraterritorial Application

■ It is well-established that Congress has the power to regulate conduct performed outside United States territory. *See EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) ("Congress has the authority to enforce its laws beyond the territorial boundaries of the United States."). It is equally well-established, however, that courts are to presume that Congress has not exercised this power—i.e., that statutes apply only to acts performed within United States territory—unless Congress manifests an intent to reach acts performed outside United States territory. *See Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 188, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993) ("Acts of Congress normally do not have extraterritorial application unless such an intent is clearly manifested."); *Arabian Am. Oil Co.*, 499 U.S. at 248, 111 S.Ct. 1227 (*quoting Foley Bros. v. Filardo*, 336 U.S. 281, 285, 69 S.Ct. 575, 93 L.Ed. 680 (1949)) ("It is a longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.' "). This "clear manifestation" requirement does not require that extraterritorial coverage should be found only if the statute itself explicitly provides for extraterritorial application. Rather, courts should consider "all available evidence about the meaning" of the statute, e.g., its text, structure, and legislative history. *Sale*, 509 U.S. at 177, 113 S.Ct. 2549; *See also Smith v. United States*, 507 U.S. 197, 201–03, 113 S.Ct. 1178, 122 L.Ed.2d 548 (1993) (examining text, structure, and legislative history).

■ Furthermore, the Supreme Court has established a limited exception to this standard approach for "criminal statutes which are, as a class, not logically dependent on their locality for the Government's jurisdiction, but are enacted because of the right of the Government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers, or agents." *United States v. Bowman*, 260 U.S. 94, 98, 43 S.Ct. 39, 67 L.Ed. 149 (1922). As regards statutes of this type, courts may infer the requisite intent "from the nature of the offense" described in the statute, and thus need not examine its legislative history.[3] *Id.* The Court further observed that "to limit the[ ] locus [of such a statute] to the strictly territorial jurisdiction [of the United States] would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds as easily committed by citizens on the high seas and in foreign countries as at home." *Id.* *Bowman* concerned a statute making it illegal knowingly to "present[ ] a false claim *against the United States, . . .* to any officer of the civil, military or naval service or to any department thereof. . . ." *Id.* at 101, 43 S.Ct. 39 (emphasis added).[4] In concluding that Congress intended this

**3.** This is not necessarily to say, however, that legislative history is entirely irrelevant under the *Bowman* exception to the standard approach. Given that the *Bowman* rule is ultimately concerned with congressional intent, if the legislative history clearly indicates that Congress intended the statute in question to apply only within the United States, it would be inconsistent with *Bowman* to ignore this evidence, and conclude—in reliance on *Bowman*—that Congress intended the statute to apply extraterritorially. Hence, in our examination below of each of the statutes targeted by Odeh, we give due attention to Odeh's arguments to the effect that a given statute's legislative history evinces Congress's intent that the statute is to apply only within the United States.

**4.** The *Bowman* Court also identified, as members of the special class of statutes to which the *Bowman* rule applies, statutes penalizing: "whoever as consul knowingly certifies a false invoice"; "[f]orging or altering ship's papers"; "enticing desertions from the naval service"; "bribing a *United States* officer of the civil, military, or naval service to violate his duty or to aid in committing a *fraud on the United States*"; "the bringing in, custody, sale or other disposition of property captured as prize, with intent to defraud, delay or *injure the United States* or any captor or claimant of such property"; "steal[ing], embezzling, or knowingly applying to his own use ordinance, arms, ammunition, clothing, subsistence stores, money or other property of *the United States* furnished or to be used for

statue to apply extraterritorially, the Court reasoned that it "cannot [be] suppose[d] that when Congress enacted the statute or amended it, it did not have in mind that a wide field for such frauds upon the Government was in private and public vessels of the United States on the high seas and in foreign ports beyond the land jurisdiction of the United States...." *Id.* at 102, 43 S.Ct. 39.

■ Odeh argues that *Bowman* is "not controlling precedent" because it "involved the application of [a] penal statute[ ] to United States citizens," i.e., not to foreign nationals such as himself. Odeh's Memo. at 17. This argument is unavailing for three reasons. First, although *Bowman* "is expressly limited by its *facts* to prosecutions of United States citizens," Odeh's Reply Memo. at 3 (emphasis added), its underlying rationale is not dependant on the nationality of the offender. Rather, *Bowman* rests on two factors: (1) the right of the United States to protect itself from harmful conduct—irrespective of the locus of this conduct, and (2) the presumption that Congress would not both (a) enact a statute designed to serve this protective function, and—where the statute proscribes acts that could just as readily be performed outside the United States as within it—(b) undermine this protective intention by limiting the statute's application to United States territory. Given that foreign nationals are in at least as good a position to perform extraterritorial conduct as are United States nationals, it would make little sense to restrict such

statutes to United States nationals. To paraphrase *Bowman*, "to limit [a statute's coverage to United States nationals] would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds as easily committed [by foreign nationals] as [by United States nationals]." *Bowman*, 260 U.S. at 98, 43 S.Ct. 39.

Second, the Courts of Appeals—focusing on *Bowman*'s general rule rather than its peculiar facts—have applied this rule to reach conduct by foreign nationals on foreign soil. For example, the Court of Appeals for this Circuit has held that 18 U.S.C. § 1546, which criminalizes the making of false statements with respect to travel documents, was intended by Congress to apply extraterritorially to the conduct of foreign nationals. *See United States v. Pizzarusso*, 388 F.2d 8, 9 (2d Cir.), *cert. denied*, 392 U.S. 936, 88 S.Ct. 2306, 20 L.Ed.2d 1395 (1968);[5] *see also United States v. Larsen*, 952 F.2d 1099, 1101 (9th Cir.1991) (21 U.S.C. § 841(a)(1)—possession of narcotics with intent to distribute); *United States v. Wright–Barker*, 784 F.2d 161, 167 (3d Cir. 1986) (same); *United States v. Orozco–Prada*, 732 F.2d 1076, 1088 (2d Cir.), *cert. denied*, 469 U.S. 845, 105 S.Ct. 154, 83 L.Ed.2d 92 (1984) (same); *United States v. Benitez*, 741 F.2d 1312, 1317 (11th Cir. 1984), *cert. denied*, 471 U.S. 1137, 105 S.Ct. 2679, 86 L.Ed.2d 698 (1985) (18 U.S.C. § 2112—theft of personal property of the United States); *United States v. Zehe*, 601 F.Supp. 196, 200 (D.Mass.1985) (18 U.S.C.

---

military or naval service." 260 U.S. at 99–100, 43 S.Ct. 39 (emphasis added).

**5.** Strictly speaking, it would be inaccurate to say that *Pizzarusso* held that *Bowman* applies to conduct performed by foreign nationals on foreign soil, because the *Pizzarusso* Court noted that *Bowman* applies strictly only to extraterritorial conduct of United States nationals. *See* 388 F.2d at 9 n. 2 (noting that *Bowman* is "distinguishable as that case involved imposition of criminal liability on United States citizens for acts committed abroad"). For all intents and purposes, however, the *Pizzarusso* Court applied *Bowman*'s presumption rule to 18 U.S.C. § 1546:

We think the Congress by the enactment of this law contemplated that it would be applied extraterritorially. Visas are documents issued to aliens permitting them to enter the country. In the ordinary course of events we would naturally expect false statements in visa applications to be made outside the territorial limits of the United States. This would seem to overcome the strong presumption that the Congress did not intend the statute to apply extraterritorially.

*Id.* at 9.

§§ 792–799—espionage). Indeed, the Eleventh Circuit has held that one of the statutes targeted by Odeh, viz., 18 U.S.C. § 1114—which penalizes murder and attempted murder of officers and employees of the United States—applies to conduct by foreign nationals on foreign soil. *See Benitez*, 741 F.2d at 1317.[5] Correlatively, no court, to date, has refused to apply the *Bowman* rule on the ground that the defendant was a foreign national.[6]

Third, the irrelevance of the defendant's nationality to the *Bowman* rule is reinforced by a consideration of the relationship between this rule and the principles of extraterritorial jurisdiction recognized by international law.[7] Under international law, the primary basis of jurisdiction is the "subjective territorial principle," under which "a state has jurisdiction to prescribe law with respect to ... conduct that, wholly or in substantial part, takes place within its territory." Restatement (Third) of the Foreign Relations Law of the United States § 402(1)(a) (1987); *see also* Christopher L. Blakesley, *Extraterritorial Jurisdiction, in* M. Cherif Bassiouni (ed.), *International Criminal Law* 47–50 (2d ed.1999). International law recognizes five other principles of jurisdiction by which a state may reach conduct *outside* its territory: (1) the objective territorial principle; (2) the protective principle; (3) the nationality principle; (4) the passive personality principle; and (5) the universality principle. *See id.* at 50–81. The objective territoriality principle provides that a state has jurisdiction to prescribe law with respect to "conduct outside its territory that has or is intended to have substantial effect with-

5. The Government would add to this list *United States v. Vasquez–Velasco*, 15 F.3d 833, 839–41 (9th Cir.1994), which held that 18 U.S.C. § 1959—violent crimes in aid of racketeering activity—applies extraterritorially. *See* Gov't Memo. at 10–11. Although admitting that the opinion itself does not specify the nationality of the defendant, the Government contends that the underlying indictment and various press reports reveal that he was a foreign national. *Id.* at 11 n. 2. Odeh responds that, "[a]s the court does not address the question of citizenship, there is no basis upon which to conclude that the court considered the matter. 'Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not [to be] considered as having been so decided as to constitute precedents.'" Odeh's Reply Memo. at 11 (*quoting Webster v. Fall*, 266 U.S. 507, 511, 45 S.Ct. 148, 69 L.Ed. 411 (1925)).

The problem with this response is that the *Vasquez–Velasco* Court's reasoning strongly indicates that the Court believed the defendant to be a foreign national. After noting (i) that "the protective principle" permits the United States to assert jurisdiction "over *foreigners* for an act committed outside the United States that may impinge on the territorial integrity, security, or political independence of the United States," the Court concluded that "extraterritorial application of § 1959 ... is appropriate in this case .... [because] the violent crime was directed against the United States...." 15 F.3d at 840, 841 (emphasis added).

In any event, the very fact that the Court found it unnecessary to mention the nationality of the defendant belies Odeh's repeated contention that the nationality of the defendant is important to the *Bowman* rationale. It is similarly noteworthy that none of the *Bowman* progeny that involve defendants who are United States citizens explicitly base their respective holdings on the fact that the defendant is a United States national. *See, e.g., United States v. Layton*, 855 F.2d 1388, 1395 (9th Cir.1988), *cert. denied*, 489 U.S. 1046, 109 S.Ct. 1178, 103 L.Ed.2d 244 (1989) (18 U.S.C. § 351—murder or attempted murder of high-ranking United States Government officials); *United States v. Cotten*, 471 F.2d 744, 750 (9th Cir.), *cert. denied*, 411 U.S. 936, 93 S.Ct. 1913, 36 L.Ed.2d 396 (1973) (18 U.S.C. § 641—theft of United States Government property).

6. Indeed, Odeh cites (and the Court is aware of) but a single case in which a court has explicitly refused to apply the *Bowman* rule, viz., *United States v. Mitchell*, 553 F.2d 996 (5th Cir.1977)—and the defendant in that case was a citizen of the United States.

7. As Odeh correctly points out, the question whether "Congress intended that [a] statute have extraterritorial effect," is distinct from and precedent to the question of whether extraterritorial application of the statute accords with international law. Odeh's Memo. at 7 n. 3. Our purpose here is merely to explain why the lower federal courts have viewed the extension of the *Bowman* rule to foreign nationals as unproblematic.

in its territory." Restatement § 402(1)(c). The protective principle provides that a state has jurisdiction to prescribe law with respect to "certain conduct outside its territory by *persons not its nationals* that is directed against *the security of the state* or against a limited class of other state interests." *Id.* § 402(3) (emphasis added). The nationality principle provides that a state has jurisdiction to prescribe law with respect to "the activities, interests, status, or relations of its nationals outside as well as within its territory." *Id.* § 402(2). The passive personality principle provides that "a state may apply law—particularly criminal law—to an act committed outside its territory by a person not its national where the victim of the act was its national.". *Id.* § 402, cmt. g. The universality principle provides that, "[a] state has jurisdiction to define and prescribe punishment for certain offenses recognized by the community of nations as of universal concern, such as piracy, slave trade, attacks on or hijacking of aircraft, genocide, war crimes, and perhaps *certain acts of terrorism,*" regardless of the locus of their occurrence. *Id.* § 404 (emphasis added). Because Congress has the power to override international law if it so chooses, *see United States v. Yunis,* 924 F.2d 1086, 1091 (D.C.Cir.1991); *United States v. Aluminum Co. of Am.,* 148 F.2d 416, 443 (2d Cir.1945); Restatement § 402, cmt. i., none of these five principles places ultimate limits on Congress's power to reach extraterritorial conduct. At the same time, however, "[i]n determining whether a statute applies extraterritorially, [courts] presume that Congress does not intend to violate principles of international law . . . . [and] in the absence of an explicit Congressional directive, courts do not give extraterritorial effect to any statute that violates principles of international law." *United States v. Vasquez–Velasco,* 15 F.3d 833, 839 (9th Cir.1994) (*citing McCulloch*

*v. Sociedad Nacional de Marineros de Honduras,* 372 U.S. 10, 21–22, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963)). Hence, courts that find that a given statute applies extraterritorially typically pause to note that this finding is consistent with one or more of the five principles of extraterritorial jurisdiction under international law. *See, e.g., United States v. MacAllister,* 160 F.3d 1304, 1308 (11th Cir.1998), *cert. denied,* —— U.S. ——, 120 S.Ct. 318, 145 L.Ed.2d 114 (1999) (objective territorial principle); *Vasquez–Velasco,* 15 F.3d at 841 (objective territoriality principle, protective principle, and universality principle); *United States v. Felix–Gutierrez,* 940 F.2d 1200, 1205–1206 (9th Cir.1991), *cert. denied,* 508 U.S. 906, 113 S.Ct. 2332, 124 L.Ed.2d 244 (1993) (objective territoriality principle, protective principle, and passive personality principle); *Benitez,* 741 F.2d at 1316 (protective principle and passive personality principle); *Pizzarusso,* 388 F.2d at 11 (protective principle).

The *Bowman* rule would appear to be most directly related to the protective principle, which, as noted, explicitly authorizes a state's exercise of jurisdiction over "conduct outside its territory *by persons not its nationals.*" Restatement § 402(3). Hence, an application of the *Bowman* rule that results in the extraterritorial application of a statute to the conduct of foreign nationals is consistent with international law. Therefore, it is not surprising that the lower courts have shown no hesitation to apply the *Bowman* rule in cases involving foreign defendants.

Odeh attempts to distinguish the preceding lower federal court cases—with the exception of *Benitez*—by arguing that they concern a special category of "inherently extraterritorial" statutes. Odeh's Reply Memo. at 7. Such statutes "regulate activities that routinely occur on the high seas or on foreign soil." *Id.* at 8 (*citing Pizzarusso,* 388 F.2d at 8).[8] According to

---

8. He also suggests (i) that these statutes are " 'inherently international in scope,' " Odeh's Reply Memo. at 8 (*quoting United States v. Evans,* 667 F.Supp. 974, 980 (S.D.N.Y.1987)), and, (ii) that courts that condone the extraterritorial application of such statutes typically "rel[y] heavily on the legislative history" thereof. *Id.* at 9 (*citing Evans* and *United States v. Pinto–Mejia,* 720 F.2d 248 (2d Cir.

Odeh, none of the statutes which he challenges, viz., 18 U.S.C. §§ 844(f), (h), and (n), 924(c), 930, 1111, 7, 114, 1114, and 2155—with the possible exception of Section 2155—fall into this category. *See id.* at 10. Rather, these statutes are "inherently domestic," "bereft of any reference to extraterritorial acts," and "lack any connection to international activities." *Id.*[9]

This attempt to distinguish the preceding lower federal court cases fails for two reasons. First, it fails for basically the same reason that Odeh's attempt to distinguish *Bowman* itself fails: It fixates on the peculiar facts of these cases rather than on the underlying *Bowman* rationale on which the courts base their respective holdings. Again, this rationale depends in no way on the nationality of the perpetrator. Rather, it depends on the right of the United States to defend itself from harmful conduct regardless of its locus, and a presumption that Congress would not undercut the effectiveness of statutes intended to serve this protective purpose by limited them to United States territory and United States nationals.

Second, as detailed below, most of the statutes targeted by Odeh are more clearly designed to protect the United States than is the drug smuggling statute, viz., 21 U.S.C. § 841(a)(1), that is on Odeh's list of "inherently extraterritorial" statutes; and, similarly, most of these statutes protect United States interests that are arguably of more importance than the interest protected by the fraudulent visa application statute, viz., 18 U.S.C. § 1546, which is

likewise on that list. Surely it would be an anomalous state of affairs if, on the one hand, a statute that provides merely that "it shall be unlawful ... to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance," 21 U.S.C. § 841(a)(1), were an "inherently extraterritorial" statute; while, on the other hand, a statute that makes it unlawful to "kill or attempt to kill any officer or employee of the United States," 18 U.S.C. § 1114, were an "inherently domestic" statute. Yet it is precisely this anomalous state of affairs that Odeh invites this Court to establish. We decline to do so.

■ A final general principle that bears on Odeh's motion provides that a statute that is ancillary to a substantive offense statute will be presumed to have extraterritorial effect if the underlying substantive statute is first determined to have extraterritorial effect. *See Felix–Gutierrez*, 940 F.2d at 1204–05 (18 U.S.C. § 3—accessory after the fact); *Chua Han Mow v. United States*, 730 F.2d 1308, 1311 (9th Cir.1984), *cert. denied*, 470 U.S. 1031, 105 S.Ct. 1403, 84 L.Ed.2d 790 (1985) (21 U.S.C. §§ 846 and 963—conspiracy and attempt; "This court has ... regularly inferred extraterritorial reach of conspiracy statutes on the basis of a finding that the underlying substantive statutes reach extraterritorial offenses."); *United States v. Yousef*, 927 F.Supp. 673, 682–83 (S.D.N.Y.1996) (18 U.S.C. § 371—conspiracy directed against the United States; 18 U.S.C. § 924(c)— using or carrying a firearm in connection with another felony).[10]

1983)). These claims are beside the point, however, because (i) neither of these cases mentions *Bowman,* and (ii) although *Evans* cites *Pizzarusso,* it does not do so for the purpose of applying *Pizzarusso* 's *Bowman* esque rule. *See also id.* at 5–6 (erroneously stating that *Evans* and *Pinto–Mejia* "cited *Bowman* when applying legislation to foreigners acting outside the territorial boundaries of the United States").

9. It is because *Benitez* condoned extraterritorial application of Section 1114 that Odeh does not attempt to distinguish it from the present case. Odeh's primary criticism of

*Benitez* is that, "[a]lthough the [*Benitez* ] court took note of the defendant's citizenship, it failed even to address the relationship between foreign citizenship and the extraterritorial application of statues." Odeh's Reply Memo. at 11–12. This criticism is question-begging, however, as this supposed "failure" has a plausible alternative explanation: The *Bowman* rationale, as noted, does not depend on the nationality of the defendant.

10. Section 924(c) is one of the statutes targeted by Odeh. *See* Odeh's Memo. at 21; Subsection I.B.2, *infra.*

### B. 18 U.S.C. §§ 844, 924, 930, 1114, and 2155

In light of the preceding general principles, we find that Congress intended each of the following statutory provisions to reach conduct by foreign nationals on foreign soil: 18 U.S.C. § 844(f)(1), (f)(3), (h) and (n); 18 U.S.C. § 924(c); 18 U.S.C. § 930(c); 18 U.S.C. § 1114; and 18 U.S.C. § 2155. We consider each in turn.

#### 1. 18 U.S.C. § 844(f), (h), and (n)

■ The Indictment predicates Count 5 [11] on 18 U.S.C. §§ 844(f) and (n); Counts 7 [12] and 8 [13] on 18 U.S.C. § 844(f), and Count 242 [14] on 18 U.S.C. § 844(h). Subsection 844(f)(1) provides:

> Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other personal or real property in whole or in part owned or possessed by, or leased to, the United States, or any department or agency thereof, shall be imprisoned for not less than 5 years and not more than 20 years, fined under this title, or both.

18 U.S.C. § 844(f)(1). Given (i) that this provision is explicitly intended to protect United States property, (ii) that a significant amount of United States property is located outside the United States, and (iii) that, accordingly, foreign nationals are in at least as good a position as are United States nationals to damage such property, we find, under *Bowman*, that Congress intended Section 844(f)(1) to apply extra-territorially—irrespective of the nationality of the perpetrator.

Subsection 844(f)(3) provides:

> Whoever engages in conduct prohibited by this subsection [ (f) ], and as a result of such conduct directly or proximately causes the death of any person, including any public safety officer performing duties, shall be subject to the death penalty, or imprisoned for not less than 20 years or for life, fined under this title, or both.

18 U.S.C. § 844(f)(3). Given that this provision is dependent on Subsection 844(f)(1), our determination that Congress intended that Subsection to apply extraterritoriality—irrespective of the nationality of the offender, leads us to conclude that Congress likewise intended this Subsection to apply extra territorially—irrespective of the nationality of the offender.

Subsection 844(h) provides in relevant part:

> Whoever (1) uses fire or an explosive to commit any felony which may be prosecuted in a court of the United States, or (2) carries an explosive during the commission of any felony which may be prosecuted in a court of the United States, including a felony which provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device shall, in addition to the punishment provided for such felony, be sentenced to imprisonment for 10 years.

11. Count 5 charges Odeh and others with conspiracy to "(i) bomb American facilities anywhere in the world, including American embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania, (ii) attack employees of the American Government stationed at those facilities ..., (iii) attack military installations and members of the American military stationed at such military installations in Saudi Arabia, Yemen, Somalia and elsewhere with bombs, and (iv) engage in conduct with the result of such conduct directly and proximately causing the death of persons...."

12. Count 7 charges Odeh and others with "detonat[ing] an explosive device that damaged and destroyed the United States Embassy in Nairobi, Kenya, and [thereby] ... caus[ing] the deaths of at least 212 persons, including Kenyan and American citizens."

13. Count 8 charges Odeh and others with "detonat[ing] an explosive device that damaged and destroyed the United States Embassy in Dar es Salaam, Tanzania, and [thereby] ... caus[ing] the deaths of at least 11 persons, including Tanzanian citizens."

14. Count 242 charges Odeh and others with "us[ing] and carr[ying] bombs in connection with the attacks on the United States embassies in Nairobi, Kenya and Dar es Salaam, Tanzania."

18 U.S.C. § 844(h). The underlying substantive felony provision on which the Indictment predicates this ancillary provision is 18 U.S.C. § 2332(b). Section 2332(b) provides in relevant part that "[w]hoever *outside the United States* . . . engages in a conspiracy to kill[ ] a national of the United States shall [be punished as further provided]." 18 U.S.C. § 2332(b) (emphasis added).[15] Because (i) Congress explicitly intended Section 2332(b) to apply extraterritorially, and (ii) foreign nationals are in at least as good a position as are United States national to engage in extraterritorial conspiracies to kill United States nationals, we find that Congress intended it to apply to foreign national offenders. Accordingly, we find that Section 844(h) likewise applies extraterritorially—irrespective of the nationality of the offender.

Subsection 844(n) provides in relevant part that "a person who conspires to commit any offense defined in this chapter shall be subject to the same penalties (other than the penalty of death) as the penalties prescribed for the offense the commission of which was the object of the conspiracy." 18 U.S.C. § 844(n). The Indictment predicates this conspiracy provision on Subsections 844(f)(1) and (f)(3). As we have already concluded that those Subsections apply extraterritorially—irrespective of the nationality of the offender, we readily conclude that Subsection 844(n) likewise applies extraterritorially—irrespective of the nationality of the offender.

Odeh advances two arguments in opposition to these conclusions about the extraterritorial reach of the preceding subsections of Section 844. First, he argues that Congress's subsequent enactment of legislation similar to Section 844, but which—unlike Section 844—explicitly provides for extraterritorial application, indicates that

Congress did not intend Section 844 to apply extraterritorially. Specifically, Odeh argues that, as 18 U.S.C. § 2332a(a)(3) "penalizes the use of explosives against . . . property 'owned, leased, or used,' by the United States [located abroad]," Odeh's Memo. at 9 (quoting 18 U.S.C. § 2332a(a)(3), ". . . . [s]urely[ ] Congress would not have felt the need to pass separate legislation penalizing the use of explosives against United States nationals abroad, if 18 U.S.C. § 844 applied extraterritorially." *Id.*

We find this argument unpersuasive. The argument appears to envision the following scenario: Wishing to prosecute bombings of federal property overseas, but aware that Section 844(f) applies only to bombings in the United States, Congress was forced to enact a separate statute, which, though covering basically the same conduct as 844(f), applies extraterritorially. Given the similarity of the two statutes, however, one wonders why Congress would not simply have amended Section 844(f) by specifying that it applies extraterritorially, or, alternatively, repeal Section 844(f) when it enacted Section 2332a(a)(3). The obvious explanation for why Congress took neither of these actions is that there are important substantive differences between Section 844(f) and Section 2332a(a)(3). The latter covers threats and conspiracies to damage United States property whereas the former does not. The former covers the use of fire for the purpose of damaging United States property whereas the latter does not. The latter covers biological weapons whereas the former does not. The former provides for fines whereas the latter does not. Hence, Congress had numerous reasons to enact Section 2332a(a)(3) other than a supposed need to cure Section 844(f)'s unfor-

---

**15.** Count 1 of the Indictment is predicated on Section 2332(b). Count 1 charges that, "[f]rom at least 1991 until [1999]" [Odeh and others] . . . conspir[ed] to "(i) murder United States nationals anywhere in the world, including the United States, (ii) kill United States nationals employed by the United States military who were serving in their offi-

cial capacity in Somalia and on the Saudi Arabian peninsula; (iii) kill United States nationals employed at the United States Embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania, including Internationally Protected Persons; and (iv) engage in conduct to conceal the activities and means and methods of the co-conspirators. . . . "

tunate "intraterritoriality." *Cf. Larsen,* 952 F.2d at 1101 (reasoning, in regard to two statutes whose relationship parallels the relationship between Sections 844(f) and 2332a(a)(3), that, because "the two statutes [did not] ha[ve] precisely the same provisions, beyond the extraterritoriality issue, . . . [these] other differences between the statutes . . . can explain Congress' intent in enacting [the later of the two].").

This said, the question remains why, given the similarity between the two statutes, Congress, at the time it enacted Section 2332a(a)(3), did not bother to make explicit Section 844(f)'s extraterritoriality—especially in light of the fact that Congress amended Section 844(f) in the very act in which Section 2332a(a)(3) was added to Title 18. *See* Violent Crime Control and Enforcement Act of 1994, Pub.L. 103–322, Title VI, § 320106, 108 Stat. 1769, 2111. The Government's proposed explanation for this omission is that "Congress is . . . well aware that under *Bowman* and its progeny, it [is] not required to explicitly spell out its intent when the nature of the conduct covered by Section [844(f) ] reflect[s] necessarily its intent to apply to foreign conduct." Gov't Memo. at 21. The problem with this explanation is that it does not really account for the difference between Congress's handling of the two statutes. Congress could have relied on *Bowman* for Section 2332a(a)(3) just as much as it supposedly relied on *Bowman* for Section 844(f). Congress chose not to rely on *Bowman* for Section 2332a(a)(3), presumably, because it wanted to leave no doubt that it intended this statute to apply extraterritorially. But then why didn't Congress likewise make Section 844(f)'s extraterritoriality explicit?

A more plausible explanation is that Congress's enactment of Section 2332a(a)(3) was carried out without concern about its relation to Section 844(f). And this is just to say that Congress's disparate treatment of these two provisions has little bearing on the issue of Section 844(f)'s extraterritoriality.

In short, we find Odeh's speculations about the relation between these two statutes insufficient to overcome our conclusion—based on *Bowman* —that Congress intended Section 844(f) to apply extraterritorially.

This brings us to Odeh's second argument. Odeh points out that "[t]he Second Circuit has recognized . . . that 'congressional consideration of an issue in one context, but not another, in the same *or similar* statutes, implies that Congress intends to include that issue only where it has so indicated.'" Odeh's Reply Memo. at 13 (*quoting United States v. Azeem,* 946 F.2d 13, 17 (2d Cir.1991)) (emphasis added by Odeh). Given (i) that Section 844(f) and Section 2332a(a) are indeed very similar, and (ii) that the latter expressly provides for extraterritorial application, whereas the former does not, courts should presume that Congress did not intend Section 844(f) to apply extraterritorially. This second argument is potentially more powerful than Odeh's first argument because it rests on an interpretive presumption rule, and thus does not require speculation about Congress's motives (as does his first argument). Indeed, if the *Azeem* rule were the only interpretive presumption rule applicable to Section 844(f), Odeh's second argument would be quite persuasive. But of course there is a second interpretive presumption rule applicable to Section 844(f): the *Bowman* rule. Given that the respective applications of these two rules to Section 844(f) yield irreconcilable conclusions about its coverage of extraterritorial conduct, the question becomes which of these two rules should be accorded precedence. "[I]t is a traditional maxim of interpretation that specific rules control over general rules." *Apostolic Pentecostal Church v. Colbert,* 169 F.3d 409, 414 (6th Cir.1999) (*citing Bulova Watch Co. v. United States,* 365 U.S. 753, 758, 81 S.Ct. 864, 6 L.Ed.2d 72 (1961)). The *Azeem* rule appears to be entirely general, applying to any and all "issues" that may be considered by Congress for inclusion within any and all types of stat-

utes. The *Bowman* rule, in contrast, applies primarily to criminal statutes, *see Kollias v. D & G Marine Maintenance*, 29 F.3d 67, 71 (2d Cir.1994), *cert. denied*, 513 U.S. 1146, 115 S.Ct. 1092, 130 L.Ed.2d 1061 (1995) (finding that "*Bowman* should be read narrowly [such that] .... only criminal statutes, and perhaps only those relating to the Government's power to prosecute wrongs committed against it, are exempt from the presumption" of intraterritoriality), and only to a single issue that may be considered for inclusion within such statutes: extraterritorial application. Given that Section 844(f) is a criminal statute, and that we are here considering the issue of its extraterritorial application, the *Bowman* rule controls. Therefore, our conclusion—based on the *Bowman* rule— that Section 844(f) applies extraterritorially survives Odeh's second argument as well.

### 2. 18 U.S.C. § 924(c)

■ The Indictment predicates Counts 243 [16] and 244 [17] on Section 924(c). Section 924(c). Section 924(c) provides in relevant part:

[A]ny person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person

may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall [be punished as further provided]....

The Indictment predicates this ancillary provision on Subsections 844(f)(1) and (f)(3). Having concluded that Congress intended those Subsections to apply extraterritorially—irrespective of the nationality of the offender, we conclude that this ancillary provision likewise applies extraterritorially—irrespective of the nationality of the offender.

### 3. 18 U.S.C. § 930(c)

■ The Indictment predicates Counts 11–233 [18] on Subsection 930(c). Subsection 930(c) provides that "[a] person who kills or attempts to kill any person in the course of a violation of subsection (a) or (b), or in the course of an attack on a Federal facility involving the use of a firearm or other dangerous weapon, shall be punished [as further provided]." 18 U.S.C. § 930(c).[19] A "Federal facility" is defined as "a building or part thereof owned or leased by the Federal Government, where Federal employees are regularly present for the purpose of performing their official duties." 18 U.S.C. § 930(g)(1). Given (i) that this provision is explicitly intended to protect vital United States interests, (ii) that a significant number of Federal facilities are located outside

16. Count 243 charges Odeh and others with "us[ing] and carry[ing] an explosive device during and in relation to [the bombing of the Unites States Embassy in Nairobi, Kenya]."

17. Count 244 charges Odeh and others with "us[ing] and carry[ing] an explosive device during and in relation to [the bombing of the Unites States Embassy in Dar es Salaam, Tanzania]."

18. Counts 11–222 charge Odeh and others with "detonat[ing] an explosive device that damaged and destroyed the United States Embassy in Nairobi, Kenya, [thereby] ... caus[ing] the deaths of [212 persons]." Counts 223–233 charge Odeh and others with "detonat[ing] an explosive device that damaged and destroyed the United States Embas-

sy in Dar es Salaam, Tanzania, [thereby] ... caus[ing] the deaths of [11 persons]."

19. Subsection 930(a) provides in relevant part that "whoever knowingly possesses or causes to be present a firearm or other dangerous weapon in a Federal facility (other than a Federal court facility), or attempts to do so, shall be fined under this title or imprisoned not more than 1 year, or both." 18 U.S.C. § 930(a). Subsection 930(b) provides that "[w]hoever, with intent that a firearm or other dangerous weapon be used in the commission of a crime, knowingly possesses or causes to be present such firearm or dangerous weapon in a Federal facility, or attempts to do so, shall be fined under this title or imprisoned not more than 5 years, or both." 18 U.S.C. § 930(b).

the United States, and (iii) that, according-
ly, foreign nationals are in at least as good
a position as are United States nationals to
attack Federal facilities, we find, under
*Bowman*, that Congress intended this pro-
vision to apply extraterritorially—irrespec-
tive of the nationality of the perpetrator.

Odeh argues that (i) because Section
930(c) was added to Section 930 by Title
VI, Section 60014 of the Violent Crime
Control and Enforcement Act of 1994,
Pub.L. 103–322, 108 Stat. 1796, 1973, and
(ii) because Title VI "contained several
statutory provisions that expressly provid-
ed for extraterritorial jurisdiction," it fol-
lows that "Congress's failure to provide for
extraterritorial jurisdiction in" Section
930(c) means that Congress did not intend
that it apply extraterritorially. Odeh's
Memo. at 10–11. As Odeh suggests in his
Reply Memorandum, this argument in-
volves an application of the *Azeem* rule.
*See* Odeh's Reply Memo. at 12–14. Hav-
ing concluded, in Subsection I.B.1 above,
that the *Bowman* rule trumps the *Azeem*
rule when the statute is criminal and the
issue is extraterritorial application, we find
that this argument cannot overcome our
earlier conclusion—based on the *Bowman*
rule—that Section 930(c) applies extrater-
ritorially.

**4. 18 U.S.C. § 1114**

■ The Indictment predicates Counts
236[20] and 237[21] on Section 1114. Section
1114 provides in relevant part:

> Whoever kills or attempts to kill any
> officer or employee of the United States
> or of any agency in any branch of the

United States Government (including
any member of the uniformed services)
while such officer or employee is en-
gaged in or on account of the perfor-
mance of official duties, or any person
assisting such an officer or employee in
the performance of such duties or on
account of that assistance, shall be pun-
ished. . . .

18 U.S.C. § 1114. Given (i) that this pro-
vision is explicitly intended to protect vital
United States interests, (ii) that a signifi-
cant number of United States officers and
employees perform their official duties in
places outside the United States, and (iii)
that, accordingly, foreign nationals are in
at least as good a position as are United
States nationals to kill or attempt to kill
United States officers and employees, we
concur with the Eleventh Circuit's holding
that the offense described by Section 1114
is "exactly the type of crime that Congress
must have intended to apply extraterritori-
ally".—irrespective of the nationality of the
offender. *Benitez*, 741 F.2d at 1317.

Odeh argues that this conclusion is be-
lied by Section 1114's legislative history.
Specifically, Odeh points out that, "[i]n
1996, Congress amended § 1114, [by] om-
itting [a] list of [specific types of] federal
employees encompassed by the statute,
and replacing it with the general lan-
guage" quoted above. Odeh's Memo. at 18
(*citing* Antiterrorism and Effective Death
Penalty Act of 1996, Pub.L. No. 104–132,
Title VII, Subtitle B, § 727(a), 110 Stat.
1302).[22] Furthermore, "at the same time
it amended § 1114, in the same piece of

---

**20.** Count 236 charges that, "[o]n or about
August 7, 1998, in Nairobi, Kenya ... [Odeh
and others] did murder and attempt to mur-
der officers and employees of the United
States Government. . . ."

**21.** Count 237 charges that, "[o]n or about
August 7, 1998, in Dar es Saalam, Tanzania
... [Odeh and others] did murder and at-
tempt to murder officers and employees of the
United States Government. . . ."

**22.** Odeh argues that, (i) because, prior to the
1996 amendment, " § 1114 only proscribed
the murder or manslaughter of any security

officer of the Department of State or Foreign
Service," and (ii) because "[o]ther employees
of the Department of State were not covered,
a notable exception given the lengthy list of
federal employees covered by the statute," it
follows that "Congress never anticipated
§ 1114 would be applied to regular embassy
employees abroad." Odeh's Memo. at 19.
This inference is undermined by the fact that
the 1996 amendment replaced the "lengthy
list of federal employees" with the following
broad, inclusive language: "any officer or
employee of the United States" and "any per-
son assisting such an officer or employee."
110 Stat. 1302.

legislation, Congress amended 18 U.S.C. § 1116, dealing with the murder or manslaughter of internationally protected persons," *id.*, by adding the following subsection:

> (c) If the victim of an offense under subsection (a) is an internationally protected person outside the United States, the United States may exercise jurisdiction over the offense if (1) the victim is a representative, officer, employee, or agent of the United States, (2) an offender is a national of the United States, or (3) an offender is afterwards found in the United States....

§ 721(c), 110 Stat. at 1298 (codified as 18 U.S.C. § 1116(c)). Odeh argues that, "[s]ince all embassy employees are internationally protected persons, and [thus] are within the scope of 18 U.S.C. § 1116(c), Congress had no need to include embassy employees abroad within the framework of 18 U.S.C. § 1114." Odeh's Memo. at 19.

This argument is reminiscent of Odeh's first argument concerning Section 844(f), albeit with one important difference: Whereas the conclusion of that argument is that Section 844(f) *in toto* does not apply extraterritorially, the conclusion of this argument is merely that Section 1114 does not apply to a narrow category of extraterritorially located employees, viz., embassy employees. The much more limited scope of the latter argument is presumably due to the fact that Sections 1114 and 1116 are even less similar to each other than are Sections 844(f) and 2332a(a)(3). Specifically, Section 1116 appears to apply to a relatively small subset of the broad class of United States employees and officers covered by Section 1114. Of course this means that the two statutes overlap to a considerable extent, and it is thus theoretically possible that Congress—despite having chosen to use broad and inclusive language in Section 1114—intended to exclude a single subset of the class of United States employees, viz., embassy employ-

ees. A court would only be justified in concluding that this was Congress's actual intention, however, on the basis of particularized evidence of this intention. The mere fact of overlap cannot suffice. Yet Odeh's argument basically relies on this mere fact. Hence, our conclusion that Congress intended Section 1114 to apply extraterritorially is unaffected by Odeh's argument.

### 5. 18 U.S.C. § 2155

■ The Indictment predicates Count 6 [23] on Section 2155(a) and (b). Subsection 2155(a) provides:

> Whoever, with intent to injure, interfere with, or obstruct the national defense of the United States, willfully injures, destroys, contaminates or infects, or attempts to so injure, destroy, contaminate or infect any national-defense material, national-defense premises, or national-defense utilities, shall be fined under this title or imprisoned not more than ten years, or both.

18 U.S.C. § 2155(a). Given (i) that this provision is explicitly intended to protect vital United States interests, (ii) that a significant number of national-defense premises and utilities are located outside the United States, and (iii) that, accordingly, foreign nationals are in at least as good a position as are United States nationals to injure such premises and utilities, we find, under *Bowman,* that Congress intended it to apply extraterritorially—irrespective of the nationality of the perpetrator.

Subsection 2155(b) provides that "[i]f two or more persons conspire to violate this section, and one or more of such persons do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be punished as provided in subsection (a) of this section." Because this conspiracy provision is ancillary to Subsection 2155(a), our finding that that Subsection applies extraterritorially—irrespective of the nationality of the

---

**23.** Count 6 charges Odeh and others with "conspir[ing] ... to destroy, ... and attempt[ing] to destroy ... national-defense ma-

terial, national-defense premises and national-defense utilities of the United States."

offender—leads us to conclude that this Subsection likewise applies extraterritorially—irrespective of the nationality of the offender.

### C. 18 U.S.C. §§ 1111 and 114

In contrast to our assessment of the preceding five statutes, we find that neither 18 U.S.C. § 1111 nor 18 U.S.C. § 114 applies to the extraterritorial conduct alleged in the counts predicated on these statutes. We consider each statute in turn.

#### 1. 18 U.S.C. § 1111

■ Counts 234 [24] and 235 [25] of the Indictment are predicated on 18 U.S.C. § 1111. Section 1111(a) defines murder in the first and second degrees. Section 1111(b) specifies the penalties for each of these two types of murder, and limits the reach of Section 1111 to murders committed "[w]ithin the special maritime and territorial jurisdiction of the United States." 18 U.S.C. § 1111(b). The "special maritime and territorial jurisdiction of the United States" is defined in 18 U.S.C. § 7. Among other places, this realm of special jurisdiction includes

> [a]ny lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection

of a fort, magazine, arsenal, dockyard, or other needful building.

18 U.S.C. § 7(3).

Odeh confines his attention to Section 7(3), arguing, on a number of grounds, that it "do[es] not extend federal court jurisdiction to acts occurring in foreign countries," including, especially, United States embassy premises. Odeh's Memo at 12 (citations and internal quotations omitted).

The Government's response to this position consists of two, seemingly independent arguments. One of these arguments likewise focuses on Section 7(3), i.e., on the meaning of "the special maritime and territorial jurisdiction of the United States." The Government bases this argument almost entirely on *United States v. Erdos*, in which the Fourth Circuit held that "18 U.S.C. § 7(3) is a proper grant of 'special' jurisdiction embracing an embassy in a foreign country acquired for the use of the United States and under its concurrent jurisdiction." 474 F.2d 157 (4th Cir.), *cert. denied*, 414 U.S. 876, 94 S.Ct. 42, 38 L.Ed.2d 122 (1973). The Government's second argument consists in the (now familiar) application of the *Bowman* rule. The specific target of the Government's *Bowman* analysis is unclear, however. At times, the Government appears to be focusing on Section 1111(a), i.e., on the substantive offense of murder.[26] At other times, however, the focus appears to be Section 7(3).[27] We consider these two arguments in reverse order.

---

**24.** Count 234 charges that "[o]n or about August 7, 1998, in Nairobi, Kenya, within the special maritime and territorial jurisdiction of the United States ... [Defendant Odeh and others] ... did kill persons at the United States Embassy Compound in Nairobi, Kenya."

**25.** Count 235 charges that "[o]n or about August 7, 1998, in Dar es Salaam, Tanzania, within the special maritime and territorial jurisdiction of the United States ... [Defendant Odeh and others] did kill persons at the United States Embassy Compound in Dar es Salaam, Tanzania."

**26.** For example, the Government argues that "because the defendants in this case, includ-

ing Odeh, were motivated by a specific intent to intimidate and coerce the United States and its citizens and employees because of their nationality, the murders ... charged in this case under Sections ... 1111 and 7(3) fit comfortably within the ambit of *Bowman*." Gov't Memo. at 21–22.

**27.** For example, responding to Odeh's appeal to the legislative history of Section 7(3), the Government argues that "[r]andom comments made during the legislative history of a statute ... do not, by themselves, change the analysis that the court should apply under *Bowman* in deciding whether the statute should be given extraterritorial effect." *Id.* at 23.

### a. The *Bowman* Argument

We consider first the Government's (apparent) attempt to apply the *Bowman* rule to Section 7(3). As noted, *Bowman* established that, as regards a certain class of criminal statutes, Congress need not "make specific provision in the law that the locus shall include the high seas and foreign countries, but allows it to be inferred from *the nature of the offense.*" 260 U.S. at 98, 43 S.Ct. 39 (emphasis added). It is evident that this rule of statutory interpretation can only be applied to statutory provisions that describe particular criminal offenses. Section 7(3), however, is not a statutory provision of this type. Instead, it specifies *locations* within which particular offenses may be committed. Hence, it simply makes no sense for a court to ask if it can be inferred, from "the nature of the offense" described in Section 7(3), that Congress intended for the courts to have jurisdiction over instances of this offense committed "out side [sic] of the strict territorial jurisdiction" of the United States. *Id.* at 98, 43 S.Ct. 39. Presented with the task of interpreting Section 7(3), a court—rather than focusing on the nature of an offense—must simply determine the meaning of expressions such as "lands ... under the exclusive and concurrent jurisdiction of the United States."

This brings us to the Government's (apparent) attempt to apply the *Bowman* rule directly to Section 1111(a), i.e., to the offense of murder. At first sight, it might be thought that this provision—unlike Section 7(3)—is susceptible to a *Bowman* analysis. It makes sense to ask whether congressional intent to apply a murder statute to murders committed beyond United States territory can be inferred from the nature of the offense of murder. Section 1111, however, does not merely define the offenses of first and second degree murder, and then specify the penalties for each of these two types of murder. If this were all it did, then *Bowman* would be relevant. The actual Section 1111, however, includes its own jurisdictional element, viz., 1111(b)—which limits Section 1111 as a whole to murders committed "[w]ithin the special maritime and territorial jurisdiction of the United States." Hence, it is misguided to attempt to apply *Bowman* to Section 1111(a). Presented with the question of whether Section 1111 applies to a particular murder, a court must determine whether this murder was committed "[w]ithin the special maritime and territorial jurisdiction of the United States." Answering this question requires the court to determine the correct interpretation of Section 7(3). And, as noted, it makes no sense to suggest that *Bowman*'s rule of interpretation can be used for this latter purpose.

### b. The *Erdos* Precedent

*Erdos* concerned the killing, in the American Embassy in the Republic of Equatorial Guinea, of one American citizen by a second American citizen. *Id.* at 158.[28] As noted, *Erdos* held that "18 U.S.C. § 7(3) is a proper grant of 'special' territorial jurisdiction embracing an embassy in a foreign country acquired for the use of the United States and under its concurrent jurisdiction." *Id.* at 160.[29]

---

**28.** The defendant was charged under 18 U.S.C. § 1112, the manslaughter parallel of Section 1111. Section 1112(a) defines voluntary and involuntary manslaughter, while Section 1112(b) limits the statute to "the special maritime and territorial jurisdiction of the United States," and specifies the respective penalties for voluntary and involuntary manslaughter.

**29.** It bears mentioning that the *Erdos* court did not reach this conclusion by means of applying the *Bowman* rule to Section 1112 and/or to Section 7(3). And it appears unlikely that its failure to do so can be attributed to its ignorance of the rule. Not only did the Court acknowledge that the issue before it was not "[t]he power of Congress to lawfully proscribe the killing of an American citizen by another American citizen within the diplomatic compound located in a foreign country," but rather Congress's "intention, i.e., statutory construction," *id.* at 159, but it cited *Bowman* twice in the course of its discussion of Section 7(3). It thus appears that the Court recognized the point made above, viz., that it simply makes no sense to apply the *Bowman* rule to a statutory provision containing its own jurisdictional element.

Unfortunately, the reasoning upon which the Court based this holding is elliptical and disjointed. The Court devoted most of its attention to a determination of the relationship between the third phrase of § 7(3) (viz., "any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building") and the first two phrases of Section 7(3) (viz., "[a]ny lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof"). The Court (correctly) determined that "the third phrase is independent of and does not modify the first two [such that] the sentence describes two kinds of places within the 'special' jurisdiction of the United States." 474 F.2d at 159. Putting this determination together with the (correct) determination that the third phrase refers to places "within the United States," [30] the Court (apparently) inferred that the first two phrases refer to places outside the United States. *Id.* Given that United States embassies are located outside the

United States, the Court was thus able to conclude that United States embassies are within the special territorial jurisdiction of the United States.

As for the Court's holding that United States embassies are under the *concurrent jurisdiction* of the United States Government, this appears to be based on the Court's determination that the United States "exercises practical dominion" over its embassies, which determination appears to be based, in turn, on the court's belief that embassies are " 'part of the territory of the United States of America.' " *Id.* at 159 (*quoting United States v. Archer*, 51 F.Supp. 708, 709 (S.D.Cal. 1943)).

We do not agree with *Erdos'* holding for three reasons. First, *Erdos'* view that the first two phrases of Section 7(3) refer to places outside of United States territory is supported neither by the legislative history of Section 7(3) and its precursors,. nor by the (closely related) history of judicial interpretation of these statutes.[31] This legislative and interpretive history indicates that Congress intended these first two phrases to refer to places within United States territory.[32]

**30.** This reading of the third phrase is correct because that phrase explicitly states that the lands in question are within one of the states of the United States. Any place within one of the states of the United States is of course within the United States.

**31.** Recourse to Section 7(3)'s legislative and interpretive history is appropriate in this regard because, as is explained in greater detail below, it is unclear from the face of the statue alone whether the first two phrases of Section 7(3) refer to lands exclusively within the territorial boundaries of the United States, or also to lands within the territory of other nations.

**32.** This appeal to legislative and interpretive history implicitly raises the question of which rule of statutory interpretation should be employed for jurisdictional provisions such as Section 7(3). We concluded above that the *Bowman* rule is inappropriate for the interpretation of such provisions. The *Erdos* Court put forward the following rule: "Where the power of Congress is clear, and the language of exercise is broad, we perceive no duty to construe a statute narrowly." 474 F.2d at 160. (And, indeed, the court's geographically broad interpretation of the first

two phrases of Section 7(3)—to refer to places outside the United States—appears to have been based on this rule.) Although this rule could be taken to exclude appeal to legislative history, this is not what the *Erdos* Court intended: The Court announced the rule only after first concluding that the legislative history of Section 7(3) is "not perfectly clear." *Id.* at 159.

It could be argued that the *Erdos* Court's own characterization of the question presented to it, and the character of the Court's own rule strongly suggest that the Court should have employed the standard interpretive rule governing extraterritoriality, viz., that "Acts of Congress normally do not have extraterritorial application unless such an intent is clearly manifested." *Sale*, 509 U.S. at 188, 113 S.Ct. 2549. Prima facie, it might appear that it makes little more sense to apply this rule to Section 7(3) than it does to apply the *Bowman* rule to it. *Erdos* demonstrates, however, that it is possible to apply an interpretive presumption rule to Section 7(3). Specifically, after noting that it is presented with the question of whether Section 7(3) should "be given extraterritorial effect," 474 F.2d at 159, the Court proceeded, in accordance with its

The ultimate source of Section 7(3) is Article I, Section 8, Clause 17 of the United States Constitution, which provides:

The Congress shall have Power ... To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings....

U.S. Const., art. I, § 8, cl. 17. Clause 17 was the primary basis of the oldest of Section 7(3)'s statutory antecedents, viz., several provisions of the Act of April 30, 1790, entitled "An Act for the Punishment of certain Crimes against the United States." Act of April 30, 1790, ch. 9, 1 Stat. at L. 112. Section 3 of that Act, for example, provided "that if any person or persons shall, within any fort, arsenal, dockyard, magazine, or in any other place or district of country, under the sole and exclusive jurisdiction of the United States, commit the crime of wilful murder, such person or persons on being thereof convicted shall suffer death." [33] *See United States v. Guiteau,* 12 D.C. 498 (1882) ("It will be observed that, in designating the places in which the commission of murder should be deemed a crime against the United States, the legislature employed substantially, and to some extent, precisely the language found in [Clause 17] which conferred upon it the power to exercise exclusive legislation over certain places.").

This 1790 antecedent of Section 7(3) remained in force until 1874, when it was codified—and, in the process, slightly altered—as Section 5339 of Chapter Three, Title 70 of the Revised Statutes of the United States. Chapter Three was entitled, "Crimes Arising within the Maritime and Territorial Jurisdiction of the United States." Section 5339 provided in relevant part that "[e]very person who commits murder—First. Within any fort, arsenal, dock-yard, magazine, or in any other place or district of country, under the exclusive jurisdiction of the Untied States ... shall suffer death." 70 Rev.Stat., ch. 3, § 5339 (1874). *See United States v. Hewecker,* 79

broad rule, to construe the first two phrases of Section 7(3) to reach lands located in foreign territory. But if this makes sense, then it also makes sense to apply *the standard rule* to those same two phrases; i.e., to interpret those phrases narrowly so as to confine their reach to United States territory. And, as noted in Subsection I.A above, the standard rule permits courts to consult "all available means," including legislative history, to ascertain Congress's intent. *Sale,* 509 U.S. at 188, 113 S.Ct. 2549.

All of this said, we think that the better view is that neither *Erdos'* broad construction rule nor the standard narrow construction rule should be applied to a statute, the purpose of which is to define jurisdiction. Like the *Bowman* rule, the standard rule was designed to apply to provisions that define offenses. When presented with the task of interpreting jurisdictional statutes such as Section 7(3), courts should simply employ the standard tools of statutory interpretation: analysis of text, structure and legislative history.

**33.** The expression "district of country" is a reference to the prospective seat of the United States Government, which seat is the concern of the first part of Clause 17.

Section Three is merely *one* of the sections that served as an antecedent of Section 7(3) because the Act did not contain a separate, purely jurisdictional section such as Section 7(3). Rather, the jurisdictional language derived from Clause 17 was repeated in various sections that provided for the punishment of substantive offenses. For example, Section 7 of the Act used the identical jurisdictional language in specifying the punishment of manslaughter, as did Section 6 in specifying the punishment for misprision of felony. It was not until the 1909 antecedent of Section 7(3) that this jurisdictional language was separated out from the various substantive offenses with which it had been combined and placed in a purely jurisdictional section. *See* 42 Cong.Rec. 1188 (1908) (statement of Sen. Heyburn) ("It is stated in the report that [Section 272 of the 1909 Act] was framed in order to avoid repeating in each section of the chapter the territorial limitations in connection with every separate section ...").

F. 59, 63 (S.D.N.Y.1896) ("The first clause of [Section 5339] is the same as section 3 of the act of 1790 . . . .").

Section 5339 then served as the basis of the immediate precursor of Section 7(3), viz., Section 272(3) of the Act of March 4, 1909—"An Act to codify, revise, and amend the penal laws of the United States." Section 272(3) differed from Section 7(3) only in not including a reference to concurrent jurisdiction. Specifically, it provided that the special territorial jurisdiction of the United States included

> any lands reserved or acquired for the exclusive use of the United States, and under the exclusive jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, dockyard, or other needful building.

Act of March 4, 1909, c. 321, § 272, 35 Stat. 1143. (In this version of the provision, the influence of Clause 17 is even more evident than it was in the previous two versions.)

Finally, the Act of June 11, 1940, c. 323, 54 Stat. 304, amended the 1909 version by striking 'exclusive' from the first phrase and inserting 'or concurrent' between 'exclusive' and 'jurisdiction' in the second phrase. No further changes have been made.

As suggested by the strong influence exerted by Clause 17 on this series of jurisdictional statutes, judicial interpretation of Clause 17 has likewise influenced the interpretation of these statutes. Historically, the most important interpretive question raised by Clause 17 has been whether, as regards lands that are purchased by the consent of the States, the Federal Government must exercise exclusive jurisdiction over such lands; or, viewed from the opposite perspective, the question has been whether the States are prohibited from retaining concurrent jurisdiction over the lands transferred to the Federal Government. Strictly construed, Clause 17 appears to permit the Federal

Government to acquire—and the State to relinquish—concurrent as well as exclusive jurisdiction. Clause 17 merely grants Congress the *power* to exercise exclusive jurisdiction over lands acquired by consent of the states. Given that a State could refuse to sell the land—such that the Federal Government could exercise no jurisdiction over it whatsoever—it would seem to follow that the State has the power to place conditions on its agreement to sell the land in question.

Until well into the Twentieth Century, however, this is not the construction of Clause 17 favored by the courts. Prior to 1885, several lower federal courts had even held that Clause 17 "prescribes the *only* mode by which [the United States] can acquire land as a sovereign power; and therefore they hold only as an individual when they obtain it in any other manner." *United States v. Penn,* 48 F. 669, 670 (C.C.E.D.Va.1880) (emphasis added); *see also United States v. Tierney,* 28 F.Cas. 159, 160 (C.C.S.D.Ohio 1864) (stating that consent of the state legislature is "essential to the exercise of exclusive jurisdiction by the United States"). In *Fort Leavenworth R. Co. v. Lowe,* however, the Supreme Court rejected this interpretation, and put in place the interpretation that would hold sway until well into the Twentieth Century. Specifically, the Court held that *"[w]hen* the title is acquired by purchase by consent of the legislatures of the states, the federal jurisdiction is exclusive of all state authority." 114 U.S. 525, 532, 5 S.Ct. 995, 29 L.Ed. 264 (1885) (emphasis added). The Court made clear, however, that this is not the exclusive procedure by which the United States may acquire exclusive jurisdiction over land located within the States. The United States may also *reserve* exclusive jurisdiction over such land at the time a state is admitted into the Union. *See* 114 U.S. at 526, 5 S.Ct. 995 ("Congress might, undoubtedly, upon such admission, . . . stipulate[ ] for retention of the political authority, dominion, and legislative power of the United States

over the reservation....").[34] This reigning interpretation came to an end in 1937, when the Supreme Court, in *James v. Dravo Contracting Company*, 302 U.S. 134, 148–50, 58 S.Ct. 208, 82 L.Ed. 155 (1937), held that Clause 17 permits the United States to acquire merely concurrent jurisdiction over lands purchased by consent of the States.

Keeping this history of the judicial interpretation of Clause 17 in mind, we now take a closer look at Section 7(3) and its precursors. The first thing to note about the (nearly identical) 1790 and 1874 precursors of Section 7(3) is that they are consistent with the then reigning judicial interpretation of Clause 17. The grammatical structure of these provisions clearly indicates that the Federal Government is presumed to have exclusive jurisdiction over forts, arsenals, dockyard, and magazines—the very types of facilities mentioned by Clause 17.

Second, each of these provisions implicitly described two distinct categories of lands over which the United States exercised exclusive jurisdiction: those acquired in the manner provided for in Clause 17, and those acquired in other ways.

Third, each of the provisions limited the Federal Government's exercise of legislative jurisdiction to lands over which the Federal Government had exclusive jurisdiction. This fact virtually guarantees that neither of these provisions was intended by Congress to extend to offenses committed in foreign territory. It is inconceivable that those earlier Congresses believed that the United States had exclusive jurisdiction over any parcel of foreign territory. Indeed, the then reigning interpretation of Clause 17 appears to have stemmed from a fundamental presupposition of those times—one that was not to be relinquished until 1937 in *Dravo*: that a government has the authority to exercise legislative jurisdiction over a given piece of land only if it has exclusive jurisdiction thereof. *See The Schooner Exchange v. M'Faddon*, 11 U.S. (7 Cranch) 116, 136, 3 L.Ed. 287 (1812) (Marshall, C.J.) ("The jurisdiction of the nation, within its own territory, is necessarily exclusive and absolute; it is susceptible of no limitation not imposed by itself.").

This brings us to the 1909 precursor of Section 7(3), viz., Section 272(3) of the Act of March 4, 1909. The first thing to notice about this provision is that it made much more explicit the fact—implicit in the two earlier provisions—that there are two basic categories of land in the special territorial jurisdiction of the United States: those acquired in accordance with the procedure specified in Clause 17, and those acquired in other ways.

Second, and more important, the language alone of Section 272(3)—unlike the language of the two earlier versions—does not strictly specify that *all* the covered lands must be under the exclusive jurisdiction of the United States. Rather, although Section 272(3) specifies that lands acquired in ways other than that provided for in Clause 17 must be under the exclusive jurisdiction of the United States, the third phrase, which concerns lands acquired as provided for in Clause 17, contains no such "exclusive jurisdiction" requirement. Hence, it is theoreti-

34. More fully, the Court observed that,
 the United States possessed, on the adoption of the constitution, an immense domain lying north and west of the Ohio river, acquired as the result of the revolutionary war, from Great Britain, or by cessions from Virginia, Massachusetts, and Connecticut; and, since the adoption of the constitution, they have, by cession from foreign countries, come into the ownership of a territory still larger, lying between the Mississippi river and the Pacific ocean, and out of these territories several states have been formed and admitted into the Union. The proprietorship of the United States in large tracts of land within these states has remained after their admission. There has been, therefore, no necessity for them to purchase or to condemn lands within those states, for forts, arsenals, and other public buildings, unless they had disposed of what they afterwards needed. Having the title, they have usually reserved certain portions of their lands from sale or other disposition, for the uses of the Government.
 114 U.S. at 532, 5 S.Ct. 995.

cally possible that the 60th Congress intended this phrase to cover lands over which the United States exercises only concurrent jurisdiction. There is a fatal flaw in this suggestion, however: Such an interpretation of the third phrase would be inconsistent with the reigning interpretation of Clause 17.[35] Indeed, in light of this reigning interpretation—not to mention the fundamental presupposition (on which that interpretation was based) that legislative jurisdiction based on land requires exclusive jurisdiction—it is far more likely that a reference to exclusive jurisdiction was omitted from the third phrase because everyone assumed that lands acquired by the consent of the states were necessarily under the exclusive jurisdiction of the United States. Correlatively, the 60th Congress included an exclusive jurisdiction requirement in the first part of Section 272(3) (pertaining to lands acquired by means other than that provided for in Clause 17) precisely because there existed for such lands no

equivalent of the reigning interpretation of Clause 17.[36]

In sum, Section 272(3), like its two predecessors, limited legislative jurisdiction by the Federal Government to lands over which the Federal Government enjoyed exclusive jurisdiction. Therefore, it no more concerned lands in foreign territory than did its two predecessors.

We come, finally, to the 1940 revision of Section 272(3) (viz., Section 7(3) itself)—which, as noted, extended the reach of the statute to lands over which the United States exercises merely concurrent jurisdiction. The House Report concerning this revision explicitly states that the revision was prompted by *Dravo* 's holding that Clause 17 permits states who consensually transfer lands to the United States to retain concurrent jurisdiction thereof. *See* H.R.Rep. No. 76–1623, at 1 (1940) ("Prior to the decision of the Supreme Court in *James v. Dravo Contracting Company* (302 U.S. 134, 58 S.Ct. 208, 82

**35.** Indeed, the Committee of Revision reported that it had "endeavored to keep as closely as possible within the declaration of the [Supreme] [C]ourt as to what the law is." 42 Cong.Rec. 1187 (1908) (statement of Sen. Heyburn).

**36.** There remains the relatively minor question of why an explicit reference to lands "reserved" for the use of the United States was added to the first part of Section 272(3). The answer has to do with the precursors of 18 U.S.C. § 13, the so-called "assimilated crimes" statute. The original version of this statute appeared as Section 3 of the Act of March 3, 1825, 4 Stat. at L. 115, and a revised version appeared as Section 5391 of the Revised Statutes of the United States. Section 5391 provided in relevant part:

> If any offense be committed in any place which has been, or may hereafter be, *ceded to and under the jurisdiction of the United States,* which offense is not prohibited by, or the punishment thereof is not specially provided for, by any law of the United States, *such offense shall be liable to, and receive, the same punishment as the laws of the State in which such place is situated....*

70 Rev.Stat. § 5391 (1874) (emphasis added). The legislative history of the 1909 Act reports that the courts had held that,

> this law did not apply to any territory that had been obtained since 1825 except by cession, and it was discovered that a great deal of property, for military reservations, for arsenals, post-offices, custom-houses, quarantine stations, and court-houses, had been acquired by reservation; that the United States, owning the land, existing in territorial form, would reserve a portion of it for Federal purposes, and then admit the State to the Union.

42 Cong.Rec. 584 (1908) (statement of Rep. Sherley).

To remedy this problem, Congress amended Section 5391 to read as follows: "Whoever, within the territorial limits of any State, organized Territory, or District, but within or upon any of the places now existing or hereafter *reserved* or acquired, described in Section 272 of this act," shall commit an act which is not criminalized by the United States, but which is criminalized by the State, shall be prosecuted under the State law. Act of March 4, 1909, ch. 321, § 289, 35 Stat.1145. Reference was made to Section 272 because (i) a crime covered by the "assimilated crime" method must be both within the territory of a State and within the jurisdiction of the United States, and (ii) 272 was the section setting out the limits of the jurisdiction of the United States.

L.Ed. 155) (December 1937), it was the accepted view that the United States acquired exclusive jurisdiction over any lands purchased with the consent of the State for any of the purposes enumerated in article I, section 8, clause 17 of the Constitution, and that any provision of a State statute retaining partial or concurrent jurisdiction was inoperable. In the *Dravo* case it was held that a State may properly retain partial or concurrent jurisdiction.") The 76th Congress believed that this holding necessitated a revision of Section 272(3) because it believed that Section 272(3) "limited the criminal jurisdiction of the Federal Government to such Federal reservations in respect to which the United States had acquired exclusive jurisdiction." *Id.*[37] As such, Section 272(3) would not apply to lands over which the States chose to retain concurrent jurisdiction. Hence, the purpose of the 1940 revision was "simply [to] restore[ ] to the Federal Government the jurisdiction it was recognized as having until the *Dravo* decision was handed down." *Id.*

This reference to "restoration" cannot be taken literally. The revision did effect a change. Specifically, "[t]he most significant effect of th[e] bill is to grant Federal courts concurrent criminal jurisdiction on reservations where the United States does not have exclusive jurisdiction." *Id.* Hence, in saying that the Bill "restores" to the Federal Government the jurisdiction it had prior to *Dravo,* the Report appears to be saying that the Federal Government will henceforth be able to exercise legislative jurisdiction over lands acquired by consent of the states where the states retain concurrent jurisdiction—just as it had been able to exercise legislative jurisdiction over lands acquired by consent of the states where the states did not retain concurrent jurisdiction. At the very least, given that Section 272(3) did not apply to lands in foreign territory, if the 76th Congress intended the Bill to extend the reach of that statute to lands in foreign territory, surely it would not have said that the purpose of the Bill was "simply [to] restore[ ]" the jurisdiction the Federal Government had enjoyed prior to *Dravo.* Nor is there the slightest mention of such an extraterritorial extension in the Act's legislative history.[38]

**37.** This statement demonstrates that the 76th Congress believed that Section 272(3) did not apply to lands within foreign territory. Again, it is inconceivable that the 76th Congress believed that the United States exercised exclusive jurisdiction over any parcel of foreign territory.

**38.** There remains a relatively minor puzzle concerning the precise means chosen by the 76th Congress to effectuate its purpose of "restoring" the Federal Government's pre-*Dravo* jurisdiction. As noted, Section 272(3) consisted of two parts. The third phrase delimited a category of lands acquired in the manner provided for in Clause 17, while the first two phrases delimited a category of lands acquired in other ways. *Dravo* concerned lands referred to by the third phrase, i.e., lands acquired by the Federal Government by the consent of West Virginia. *See Dravo,* 302 U.S. at 143, 58 S.Ct. 208. As such, *Dravo,* strictly speaking, had no effect on the first two phrases of Section 272(3). Hence, if Congress were concerned to do no more than remedy the specific damage done by *Dravo,* one would have expected Congress to amend 272(3) simply by adding an "exclusive or concurrent jurisdiction" requirement to the third

phrase—leaving the first two phrases unaltered. This is not what Congress did, however. Rather, Congress left the third phrase unaltered and added a reference to concurrent jurisdiction to the first part of Section 272(3).

The simplest explanation for this decision is that Congress (mistakenly) believed that the second phrase of 272(3) related to the third phrase as well as the first phrase, such that adding 'concurrent' to the second phrase had the effect of altering the third phrase. A more plausible explanation is that the amendment was chosen against a background in which it was assumed that the two parts of Section 272(3) each required exclusive jurisdiction—despite the fact that this requirement was not mentioned in the second part. In light of this assumption, it would have been entirely natural to effect an implicit change in the second part by making an explicit change in the first part.

Admittedly, however, this explanation is not entirely satisfying either, because it does not address the substantive effect of the alteration on the first part of Section 273(2). The insertion of the reference to concurrent jurisdiction in the first part had the effect of per-

In sum, the legislative and interpretive history of Section 7(3) strongly supports Odeh's position that Section 7(3) does not concern lands outside the United States.

A second flaw of *Erdos'* handling of Section 7(3) concerns the reasoning supporting the Court's conclusion that the United States has *concurrent jurisdiction* over United States embassy premises. This conclusion appears to be based on the Court's application of the following test: "The test, as to property within or without the United States, is one of practical usage and dominion exercised over the embassy or other federal establishment by the United States Government." 474 F.2d at 159. Although the Court is silent about the provenance of this test, it appears to be the Court's own gloss of the "exclusive or concurrent jurisdiction" requirement of the second phrase of Section 7(3). The basic problem with this gloss is that, in light of the preceding account of Section 7(3)'s legislative and interpretive history, this gloss appears to be nothing more than an unnecessary exercise of judicial speculation. Instead of giving due attention to the 1940 House Report's explanation for the insertion of the term 'concurrent' into the 1909 version of the statute, the *Erdos* Court simply presumed that, "concurrent jurisdiction," means the practical exercise of dominion over land—whatever, exactly, that, in turn, means. The preceding examination of Section 7(3)'s legislative and interpretive history shows quite clearly that "concurrent jurisdiction" refers to a state of affairs in which the Federal Government and one of the States of the United States exercise legislative jurisdiction over a portion of United States territory. And, needless to say, lands in foreign territory are neither part of the territory of the United States nor part of the territory of any State of the United States.

Furthermore, even assuming that *Erdos'* "practical dominion" test were unproblematic, the Court's application of this test is undermined by its apparent reliance on a false assumption, viz., that United States embassy property is " 'part of the territory of the United States of America.' " *Id.* at 159 (*quoting United States v. Archer*, 51 F.Supp. 708, 709 (S.D.Cal. 1943)). The Ninth Circuit—i.e., *Archer*'s circuit—implicitly contradicted *Archer* when it stated that "[a] United States embassy ... remains the territory of the receiving state, and does not constitute territory of the United States." *McKeel v. Islamic Republic of Iran*, 722 F.2d 582, 588 (9th Cir.1983); *see also Poole v. Brown*, 706 F.Supp. 74, 76 (D.D.C.1989) (same); Jordan J. Paust, *Non–Extraterritoriality of "Special Territorial Jurisdic-*

---

mitting the Federal Government to exercise legislative jurisdiction over lands acquired by means other than that provided for in Clause 17, and over which the Federal Government exercised merely concurrent jurisdiction—an effect not strictly required to restore matters to their pre-*Dravo* status. The most plausible explanation for this alteration has to do with that fundamental assumption that underlay both the pre- 1940 versions of the statute and the pre-*Dravo* interpretation of Clause 17: the assumption that a Government can exercise legislative jurisdiction over a piece of land only if it enjoys exclusive jurisdiction over it. This assumption thus underlay both parts of Section 272(3). In reversing the reigning interpretation of Clause 17, the *Dravo* Court also called into question this fundamental assumption. In holding that West Virginia could retain concurrent jurisdiction over land it had conveyed to the United States, *Dravo* held that there was nothing

amiss with the Federal Government exercising concurrent jurisdiction over this very same land. As such, there was no longer any reason to limit either of the two parts of Section 273(2) to lands over which the Federal Government exercises exclusive jurisdiction. This explains why Congress did not respond to *Dravo* simply by adding an "exclusive or concurrent jurisdiction" clause to the third phrase of Section 272(3). Such an amendment would have established a baseless distinction between the lands delimited by this phrase and the lands delimited by the first two phrases. No plausible rationale could be advanced for permitting federal jurisdiction over lands acquired by consent of the state where the state retained concurrent jurisdiction, but not permitting it over lands reserved by the United States upon admitting one of the states to the Union where the reservation provided for the United States to retain concurrent jurisdiction thereof.

tion" of the United States: *Forgotten History and the Errors of Erdos,* 24 Yale J. Int'l L. 305, 310–11 & nn. 16–21, 312 n. 28 (citing and quoting sources) (same).

Third, *Erdos'* holding that the United States has concurrent jurisdiction over United States embassy premises is inconsistent with international law. To understand why this is the case, it is useful to begin with the Government's attempt to bolster this holding. The Government contends that this holding is supported by the following passage from the Restatement:

'Diplomatic and consular premises are immune from search, requisition, attachment, or execution. Premises are also immune from taxation. Whether they are immune from other means of law enforcement, or from the receiving state's jurisdiction generally, has not been authoritatively addressed. Applying general principles, this section declares that premises and related property are subject to the host state's jurisdiction to prescribe, adjudicate, or enforce law except by means or in circumstances where an exercise of jurisdiction would violate the premises or interfere with their use for the designated purposes. For example, fire codes, noise regulations, and similar rules of general applicability apply to diplomatic and consular premises as to other premises. *Inviolability, and the sovereign immunity of the sending state from adjudication and judicial enforcement, largely immunize the premises from the exercise of jurisdiction by the receiving state to adjudi-*

cate or enforce law without the consent of the sending state.'

Gov't Memo at 24–25 (*quoting* Restatement § 466, cmt. c) (emphasis added by the Government). The Government's point appears to be that, because the receiving state cannot exercise its territorial jurisdiction over diplomatic premises, it follows that the sending state *can* exercise its territorial jurisdiction over these premises. The problem with this point is that it is largely undermined by the very section of the Restatement from which the Government draws the preceding quotation. This section states that to say "[t]hat premises are inviolable does not mean that they are extraterritorial. Acts committed on those premises are within the territorial jurisdiction of the receiving state, and the mission is required to observe local law. . . . See Comment C." Restatement § 466, cmt. a; [39] *see also id.* § 466, Reporter's Note 2 ("In 1977, following occupation of the Yugoslav Mission to the United Nations by terrorists, New York City police and the FBI prevented armed Yugoslavian officials from retaking the Mission. . . . The State Department denied Yugoslavian assertions that the mission was extraterritorial.").[40]

When one considers the practical consequences of claiming that the United States has concurrent *territorial* jurisdiction over United States embassy premises, it comes as no surprise that the Restatement does not support this claim. Section 7(3) speaks of concurrent jurisdiction over "lands." As such, it concerns jurisdiction based on the subjective territorial principle. Such jurisdiction is based on a na-

---

**39.** Comment c is the very subsection of Section 466 quoted by the Government.

**40.** We note parenthetically that this doctrine that the inviolability of embassy premises does not render such premises United States territory closely parallels the accepted view of the status of Federal facilities located within the States of the United States where the Federal Government has not explicitly reserved or acquired exclusive or concurrent jurisdiction. *See Surplus Trading Co. v. Cook,*

281 U.S. 647, 650, 50 S.Ct. 455, 74 L.Ed. 1091 (1930) ("It is not unusual for the United States to own within a state lands which are set apart and used for public purposes. Such ownership and use without more does not withdraw the lands from the jurisdiction of the state. On the contrary, the lands remain part of her territory and within the operation of her laws, save that the latter cannot affect the title of the United States or embarrass it in using the lands or interfere with its right of disposal.").

tion's sovereignty over its own territory. It is inherent in the very idea of national sovereignty that a nation has exclusive territorial jurisdiction over its own territory. *See The Schooner Exchange,* 11 U.S. (7 Cranch) at 136. It is precisely because the States that comprise the United States are not independent, sovereign nations, but rather political sub-units of the United States, that it is possible for the federal Government and a state Government to have concurrent territorial jurisdiction over a single piece of territory. *See North Dakota v. United States,* 495 U.S. 423, 429, 110 S.Ct. 1986, 109 L.Ed.2d 420 (1990) ("A territory under concurrent jurisdiction is generally subject to the *plenary authority* of both the Federal Government and the State for the purposes of the regulation of liquor as well as the exercise of other police powers.") (emphasis added). Therefore, to say that the United States and another independent, sovereign nation, say, Kenya, have concurrent *territorial* jurisdiction over the United States Embassy premises in Nairobi is to say that these premises are "subject to the plenary authority of both the United States and Kenya". Such a state of affairs is clearly inconsistent with the very idea of national sovereignty.[41]

We hasten to emphasize that we are not contending that concurrent jurisdiction *per se* by two sovereign nations is inconsistent with international law. Under various circumstances, concurrent jurisdiction is permitted by international law. For example, if Nation A's jurisdiction over a particular offense is based on the subjective territorial principle, Nation B could have jurisdiction over the same offense based on one or more of the five jurisdictional principles on which extraterritorial jurisdiction may be based. *See Laker Airways Ltd. v. Sabena, Belgian World Airlines,* 731 F.2d 909, 922 (D.C.Cir.1984) ("Because two or more states may have legitimate interests in prescribing governing law over a particu-

lar controversy, these jurisdictional bases are not mutually exclusive. For example, when the national of one state causes substantial effects in another state, both states may potentially have jurisdiction to prescribe governing law. Thus, under international law, territoriality and nationality often give rise to concurrent jurisdiction.") (citations omitted); Restatement § 403, cmt. d.

 Having concluded that an interpretation of Section 7(3) under which the United States has concurrent jurisdiction over United States embassy premises would violate international law, our work is not finished. It is well-established that Congress has the power to override international law. *See United States v. Yunis,* 924 F.2d 1086, 1091 (D.C.Cir.1991); Restatement § 402, cmt. i. Courts are to presume, however, that Congress generally intends its statutes to be consistent with international law. *See Murray v. The Charming Betsy,* 6 U.S. (2 Cranch) 64, 117–18, 2 L.Ed. 208 (1804) (stating that "an Act of Congress ought never to be construed to violate the law of nations if any other possible construction remains"). This presumption can be overcome only by a clear statement of intent to override international law. *See Cook v. United States,* 288 U.S. 102, 119–20, 53 S.Ct. 305, 77 L.Ed. 641 (1933) (stating that "[a] treaty will not be deemed to have been abrogated or modified by a later statute, unless such a purpose on the part of Congress has been clearly expressed"); *United States v. Palestine Liberation Org.,* 695 F.Supp. 1456, 1465, 1468 (S.D.N.Y.1988) (same). No such expression of intent appears in either the text or the legislative history of Section 7(3).

In light of the foregoing considerations, we find that United States embassy premises in foreign countries are not "lands reserved or acquired for the use of the United States, and under the exclusive or

---

41. In view of this result, it is unsurprising that the Restatement's view (that embassy territory is territory of the receiving state) is shared by numerous courts and commenta-

tors. *See* Paust, *Errors of Erdos,* at 310–11 & nn. 16–21, 312 n. 28 (citing and quoting sources).

concurrent jurisdiction thereof," under 18 U.S.C. § 7(3), and thus are not included within "the special territorial jurisdiction" of the United States. Accordingly, we further find that 18 U.S.C. § 1111, which penalizes murder within "the special maritime and territorial jurisdiction of the United States," does not apply to murders committed on United States embassy premises.[42] Therefore, as Counts 234 and 235 of the Indictment charge Odeh and his co-defendants with the commission of mur-

der on the premises of the United States Embassies in Nairobi, Kenya and Dar es Salaam, Tanzania—under 18 U.S.C. § 1111—Odeh's motion to dismiss Counts 234 and 235 for lack of jurisdiction is granted.[43]

### 2. 18 U.S.C. § 114

■ The Indictment predicates Counts 240[44] and 241[45] on Section 114. Section 114 criminalizes maiming within the spe-

---

**42.** We note parenthetically that a reading of Section 7(3), and thereby Section 1111, under which they do not extend to lands within foreign territory will not significantly diminish the Government's ability to prosecute the conduct alleged in this case. In theory, such conduct could be reached by statutes based on extraterritorial jurisdictional principles other than the subjective territorial principle. And, indeed, many such statutes have already been enacted. To identify (many of) them, one need look no further than the Indictment. Specifically, Counts 7 and 8 rely on 18 U.S.C. § 844(f)(3)—the extraterritorial application of which is justified by the protective principle— to reach all of the deaths caused by the two embassy bombings. Similarly, Counts 9 and 10 rely on 18 U.S.C. § 2332a(a)(1) and (a)(3)—the extraterritorial application of which are justified, respectively, by the passive personality principle and the protective principle—to reach all of the deaths caused by the two embassy bombings. Again, Counts 11–233 rely on 18 U.S.C. § 930(c)—the extraterritorial application of which is based on the protective principle—to reach all of the deaths caused by the two embassy bombings. Counts 236 and 237 rely on 18 U.S.C. § 1114—the extraterritorial application of which is based on the protective principle—to reach the murders of officers and employees of the United States in connection with the two embassy bombings. Similarly Counts 238 and 239 rely on 18 U.S.C. § 1116—the extraterritorial application of which is based on the universality principle, *see United States v. Layton*, 509 F.Supp. 212, 221–24 (N.D.Cal. 1981)—to reach the murders of Internationally Protected Persons in connection with the two embassy bombings.

Indeed, the Government conceded at oral argument that, if Counts 234 and 235 were dismissed, "there would be no evidence which would not be admissible and no conduct which would not be covered by other counts in th[e] indictment." Tr. Oral Arg. at 36–37 (Feb. 29, 2000).

**43.** We note that this conclusion has no effect on our earlier conclusions that Sections 930(c) and 1114 apply extraterritorially. The possibility of such an effect is presented by the fact that each of these sections includes a reference to Section 1111. Specifically, Section 930(c) specifies that a person found guilty of the offenses described therein "shall be punished as provided in section 1111...." 18 U.S.C. § 930(c). Section 1114 specifies that a person found guilty of the offenses described therein "shall be punished (1) in the case of murder, as provided under section 1111." 18 U.S.C. § 1114. The question thus arises whether these references to Section 1111 are limited to the penalties specified in Section 1111(b), or also are meant to include Section 1111(b)'s jurisdictional limitation to "the special maritime and territorial jurisdiction of the United States." For the following two reasons, we think that Congress intended to refer only to Section 1111(b)'s penalty provisions. First, the referring language itself indicates that only Section 1111(b)'s penalty provisions are being referred to. Second, a reading of Sections 930(c) and 1114 under which they were also intended to refer to Section 1111(b)'s jurisdictional provision "would be at odds with the long-established understanding of [Section] 1114," *United States v. Brunson*, 549 F.2d 348, 352 n. 1 (5th Cir.1977) (*citing United States v. Rivera*, 513 F.2d 519, 521 n. 1 (2d Cir.), *cert. denied*, 423 U.S. 948, 96 S.Ct. 367, 46 L.Ed.2d 284 (1975)), and Section 930(c).

**44.** Count 240 charges that, "[o]n or about August 7, 1998, ... within the special maritime and territorial jurisdiction of the United States, [Odeh and others maimed] persons on and within the compound of the United States Embassy in Nairobi, Kenya."

**45.** Count 241 charges that, "[o]n or about August 7, 1998, ... within the special maritime and territorial jurisdiction of the United States, [Odeh and others maimed] persons on and within the compound of the United States Embassy in Dar es Salaam, Tanzania."

cial maritime and territorial jurisdiction of the United States. Accordingly, the preceding analysis of Section 1111 applies, *mutatis mutandis*, to it. Therefore, Odeh's motion to dismiss Counts 240 and 241 for lack of jurisdiction is likewise granted.[46]

## II. Fifth Amendment Due Process

Odeh argues that application of several of the statutes relied on in the Indictment to the extraterritorial conduct of a foreign national such as himself violates his rights under the Due Process Clause of the Fifth Amendment. *See Larsen*, 952 F.2d at 1100 ("Congress is empowered to attach extraterritorial effect to its penal statutes so long as the statute does not violate the due process clause of the Fifth Amendment."). More specifically, Odeh argues that "[t]here are several, related norms of due process" that would be violated by such application: (1) the rule of lenity, (2) the right to fair warning, and (3) the requirement of a sufficient nexus between his alleged conduct and the United States. Odeh's Reply Memo. at 18. We consider his arguments regarding each of these three aspects of due process *seriatim*.

### A. Rule of Lenity

Odeh argues that, as "18 U.S.C. §§ 844(f), (h) and (n); 2155, 930, 1111; 1114; 114; and 924(c)," "fail to clearly proscribe the conduct of a foreign national on foreign soil," the rule of lenity requires the Court to dismiss the counts based on these statutes. Odeh's Memo. at 22–23. Similarly, Odeh appears to argue that, because 18 U.S.C. §§ 1116 and 2332a are "ambiguous with regard to enforcement vis-a-vis foreign nationals," the counts

based on them should likewise be dismissed. Id. 24.

■ Under the rule of lenity, an ambiguous criminal statute is to be strictly construed against the Government. *See United States v. Lanier*, 520 U.S. 259, 266, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997); *United States v. Bass*, 404 U.S. 336, 347, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971) ("In various ways over the years, we have stated that when a choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite."). As to the threshold determination of whether the statute in question is ambiguous, the Supreme Court has consistently held that "the rule of lenity applies only if, after seizing everything from which aid can be derived, [a court] can make no more than a guess as to what Congress intended." *Holloway v. United States*, 526 U.S. 1, 119 S.Ct. 966, 972, 143 L.Ed.2d 1 (1999) (citations and internal quotations omitted).

As to Sections 1111 and 114, we have already found that the counts based on these statues (viz., Counts 234, 235, 240, and 241) should be dismissed, and Odeh's rule of lenity argument as to them is of course moot.

As for Sections 844, 924, 930, 1114, and 2155, having found that each of these statutes—viewed through the lens provided by *Bowman*—clearly applies extraterritorially (i.e., having found that none of them is the least bit ambiguous in this regard), we conclude that the rule of lenity is inapplicable to them.[47] Therefore, we deny Odeh's

---

46. Just as our conclusion that Section 1111 does not apply to murders committed on United States embassy premises abroad should not significantly hamper the Government's ability to prosecute such murders, so our conclusion here that Section 114 does not apply to maimings committed on United States embassy premises abroad should not significantly hamper the Government's ability to prosecute such maimings. When questioned about this issue at oral argument, the

Government responded that, if the Counts based on Section 114 were dismissed, "there might be a small quantum of evidence that may or may not get before the jury...." Tr. Oral Arg. at 37.

47. The Government contends that "the rule of lenity simply does not apply to questions of jurisdiction." Gov't Memo. at 31. In support of this contention, the Government quotes the *Bowman* Court's claim that " '[n]or can the

motion to dismiss the counts predicated on these statutes (viz., Counts 5–8, 11–233, 236–237, and 242–244) insofar as this motion depends on his rule of lenity argument.

 This brings us to Section 1116, on which Counts 238[48] and 239[49] of the Indictment are predicated. Section 1116(a) provides that, "[w]hoever kills or attempts to kill a foreign official, official guest, or internationally protected person, shall be punished [as further provided]." 18 U.S.C. § 1116(a).[50] Section 1116(c) provides in relevant part that, "[i]f the victim of an offense under subsection (a) is an internationally protected person *outside the United States*, the United States may exercise jurisdiction over the offense if (1) the victim is a representative, officer, employee, or agent of the United States...." 18 U.S.C. § 1116(c) (emphasis added). Given (i) that Section 1116(c) explicitly

much-quoted rule that criminal statutes are to be strictly construed avail.'" *Id.* at 32 (*quoting Bowman*, 260 U.S. at 102, 43 S.Ct. 39). Yet *Bowman* 's handling of the rule of lenity actually supports the opposite position, i.e., that the rule of lenity can apply to the question of whether a statute applies extraterritorially. After making the quoted statement, the *Bowman* Court went on to say that penal statutes "are not to be strained either way. It needs no forced construction to interpret section 35 as we have done [i.e., as applying extraterritorially]." *Bowman*, 260 U.S. at 102, 43 S.Ct. 39. Hence, the Court appears to have been saying merely that the rule of lenity was unavailing because the particular statute was not ambiguous. This claim obviously presupposes that it makes sense to apply the rule of lenity to questions of jurisdiction.

**48.** Count 238 charges that, "[o]n or about August 7, 1998, in Nairobi, Kenya ... [Odeh and others] did murder and attempt to murder the Ambassador of the United States to Kenya, and other representatives, officers, employees and agents of the United States Government...."

**49.** Count 239 charges that, "[o]n or about August 7, 1998, in Dar es Salaam, Tanzania ... [Odeh and others] did attempt to murder the Ambassador of the United States to Tanzania, and other representatives, officers, employees and agents of the United States Government...."

**50.** An "internationally protected person" is

provides for jurisdiction over murders and attempted murders of certain United States officials that take place in foreign territory, and (ii) that, accordingly, foreign nationals are in at least as good a position as are United States nationals to carry out such murders and attempted murders, we find, under *Bowman*, that Section 1116(c) unambiguously applies to offenders who are foreign nationals.

In light of this finding, we further find that the rule of lenity is inapplicable to Section 1116. We therefore deny Odeh's motion to dismiss the counts predicated on Section 1116 (viz., Counts 238 and 239) insofar as this motion depends on his rule of lenity argument.

We come, finally, to Section 2332a, on which the Indictment predicates Counts 4,[51] 9,[52] and 10.[53] Section 2332a(a) provides in relevant part:

> (A) a Chief of State or the political equivalent, head of government, or Foreign Minister whenever such person is in a country other than his own and any member of his family accompanying him; or
>
> (B) any other representative, officer, employee, or agent of the United States Government, a foreign government, or international organization who at the time and place concerned is entitled pursuant to international law to special protection against attack upon his person, freedom, or dignity, and any member of his family then forming part of his household.

18 U.S.C. § 1116(b)(4).

**51.** Count 4 charges Odeh and others with conspir[ing] ... to "(i) bomb the American embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania, and employees of the American Government stationed at those embassies, and (2) attack American military facilities in the Gulf region and Horn of Africa, and members of the American military stationed in Saudi Arabia, Yemen, Somalia and elsewhere with bombs."

**52.** Count 9 charges Odeh and others with "attack[ing] the American embassy in Nairobi, Kenya, and employees of the American Government stationed at this embassy with a bomb."

**53.** Count 10 charges Odeh and others with "attack[ing] the American embassy in Dar es Salaam, Tanzania, and employees of the American Government stationed at this embassy with a bomb."

A person who, without lawful authority, uses, threatens, or attempts or conspires to use, a weapon of mass destruction ..., including any biological agent, toxin, or vector ... (1) against a national of the United States while such national is *outside of the United States;* ... or (3) against any property that is owned, leased or used by the United States or by any department or agency of the United States, whether the property is within or *outside of the United States,* shall [be punished as further provided].

18 U.S.C. § 2332a(a) (emphasis added). Given (i) that Section 2332a(a) explicitly provides for jurisdiction over attacks on United States property and nationals that take place outside the United States, and (ii) that, accordingly, foreign nationals are in at least as good a position as are United States nationals to carry out such attacks, we find, under *Bowman,* that Section 2332a(a) unambiguously applies to offenders who are foreign nationals.

In light of this finding, we further find that the rule of lenity is inapplicable to Section 2332a. We therefore deny Odeh's motion to dismiss the counts predicated on Section 2332a (viz., Counts 4, 9, and 10) insofar as this motion depends on his rule of lenity argument.

### B. Right to Fair Warning

 Odeh argues that application of Sections 844(f), (h), and (n); 924(c); 930(c); and 2155 to the extraterritorial conduct he is alleged to have engaged in would violate his due process right to a fair warning. *See* Odeh's Memo. at 26. The Supreme Court has held that those subject to the law have a right to a "fair warning ... in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear." *McBoyle v. United States,* 283 U.S. 25, 27, 51 S.Ct. 340, 75 L.Ed. 816 (1931) (Holmes, J.); *see also Lanier,* 520 U.S. at 265, 117 S.Ct. 1219 ("[N]o man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.") (citations and internal quotations omitted). Odeh argues that, as his "[c]ounsel has found no cases that uphold, or even discuss, the application" of these Sections to extraterritorial conduct, "no reasonable foreign citizen would have known he risked a death sentence for" engaging in the conduct proscribed by these Sections while in foreign territory. Odeh's Memo. at 26–27.

The Government responds that "while Odeh may not have known [the] breadth of the statutory framework that would serve as the basis for the charges against him—few defendants do—there is no room for him to suggest that he has suddenly learned that mass murder was illegal in the United States or anywhere else." Gov't Memo. at 34. We agree. *Cf. United States v. Royal Caribbean Cruises Ltd.,* 11 F.Supp.2d 1358, 1366 (S.D.Fla.1998) (giving extraterritorial effect to 18 U.S.C. § 1001 (penalizing false statements), and noting that "contending a due process violation by a statute ... which penalizes the inherently bad conduct of lying to the Government about something important is unconvincing").[54]

---

**54.** The Government also argues that "Odeh cannot be surprised to learn that his conduct was criminal under the laws of every civilized nation, and [thus] he has no right to complain about the particular forum in which he is brought to trial." Gov't Memo. at 34. We likewise find this argument persuasive. *Cf. United States v. Martinez–Hidalgo,* 993 F.2d 1052, 1056 (3d Cir.1993) ("Inasmuch as the trafficking of narcotics is condemned universally by law-abiding nations, we see no reason to conclude that it is 'fundamentally unfair' for Congress to provide for the punishment of persons apprehended with narcotics on the high seas."); Christopher L. Blakesley, *Extraterritorial Jurisdiction, in* M. Cherif Bassiouni (ed.), *International Criminal Law* 72, 70 (2d ed.1999) (noting that terrorist violence includes "wanton violence against innocent civilians," and that this offense is "condemned by virtually all domestic law"); *id.* at 73 ("[A]ll nations condemn, prosecute and punish terrorist violence, when perpetrated against them or their nationals.").

In sum, we find that application of Sections 844(f), (h), and (n); 924(c); 930(c), and 2155 to Odeh's alleged extraterritorial conduct does not violate his right to a fair warning. Therefore, we deny his motion to dismiss the counts based on these statutes (viz., Counts 5–8, 11–233, and 242–244) insofar as this motion depends on his fair warning argument.

## C. Sufficient Nexus

■■■ Odeh contends that, "[a]s [he] is Jordanian, and the acts alleged in the indictment all took place on foreign soil, the connection between [him] and the United States is weak," Odeh's Reply Memo. at 18–19, i.e., the nexus between him and the Unites States is insufficient.[55]

Few cases have addressed this sufficient nexus requirement. *See* Lea Brilmayer & Charles Norchi, *Federal Extraterritoriality and Fifth Amendment Due Process*, 105 Harv.L.Rev. 1217, 1219 n. 12 (1992) (stating that "[f]ew cases seriously discuss the constitutional question [of whether the Due Process Clause limits the extraterritorial application of federal statutes], and none invalidate application of federal law on these grounds"). The most extensive discussion of the issue appears in *United States v. Davis*, 905 F.2d 245 (9th Cir. 1990), *cert. denied*, 498 U.S. 1047, 111 S.Ct. 753, 112 L.Ed.2d 773 (1991). *Davis* announced that, "[i]n order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." *Id.* at 248–49; *see also United States v. Klimavicius–Viloria*, 144 F.3d 1249, 1257 (9th Cir. 1998), *cert. denied*, — U.S. —, 120 S.Ct. 110, 145 L.Ed.2d 94 (1999) (*quoting World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)) ("The nexus requirement serves the same purpose as the 'minimum contacts' test in personal jurisdic-

tion. It ensures that a United States court will assert jurisdiction only over a defendant who 'should reasonably anticipate being haled into court' in this country."); *United States v. Caicedo*, 47 F.3d 370, 372 (9th Cir.1995) ("[P]unishing a crime committed on foreign soil ... is an intrusion into the sovereign territory of another nation. As a matter of comity and fairness, such an intrusion should not be undertaken absent proof that there is a connection between the criminal conduct and the United States sufficient to justify the United States' pursuit of its interests."). *Davis* concerned the prosecution of a foreign national—arrested on the high seas—for attempting to smuggle marijuana into the United States under the Maritime Drug Law Enforcement Act, 46 U.S.C. app. §§ 1903(a, j). *See* 905 F.2d at 247. After observing (i) that "[i]nternational law principles [of extraterritorial jurisdiction] may be useful as a rough guide of whether a sufficient nexus exists between the defendant and the United States so that application of the statute in question would not violate due process," *id.* at 249 n. 2, and (ii) that "[w]here an attempted transaction is aimed at causing criminal acts within the United States, there is a sufficient basis for the United States to exercise jurisdiction," *id.* at 249 (citations and quotations omitted), the Court held that a sufficient nexus existed because "[t]he facts found by the district court ... support the reasonable conclusion that [the defendant] intended to smuggle contraband into United States territory," *id.* (It is evident that this holding was "roughly guided" by the objective territoriality principle.)

An earlier Ninth Circuit opinion had held that "there was more than a sufficient nexus with the United States to allow the exercise of jurisdiction ..... [because] drug trafficking may be prevented under the protective principle of jurisdiction, without any showing of an actual effect on

---

**55.** Odeh fails to specify which statutes he has in mind. We assume that he is referring to the statutes identified in his fair warning argument, viz., Sections 844, 924, 930, and 2155.

the United States." *United States v. Peterson*, 812 F.2d 486, 493–94 (9th Cir.1987) (*citing United States v. Pizzarusso*, 388 F.2d 8, 10–11 (2d Cir.), *cert. denied*, 392 U.S. 936, 88 S.Ct. 2306, 20 L.Ed.2d 1395 (1968)). We agree that if the extraterritorial application of a statute is justified by the protective principle, such application accords with due process. Therefore, given that the extraterritorial application of Sections 844, 924, 930, and 2155 to Odeh's alleged extraterritorial conduct is justified by the protective principle, *see* Subsection I.B, *supra*, we conclude that the extraterritorial application of these statutes to Odeh's conduct satisfies due process. 707 F.2d 663, 667–68 (2d. Cir.), *cert. denied*, 463 U.S. 1215, 103 S.Ct. 3555, 77 L.Ed.2d 1400 (1983).

### III. Constitutional Authority

■ Odeh argues that the Counts based on 18 U.S.C. §§ 2332 (viz., Count 1) and 2332a (viz., Counts 4, 9, and 10) must be dismissed because these statutes are unconstitutional in that they exceed Congress's authority to legislate under the Constitution. *See* Odeh's Memo. at 27–29. As noted above, Subsection 2332(b) provides in relevant part that "[w]hoever outside the United States ... engages in a conspiracy to kill[ ] a national of the United States shall [be punished as further provided]," 18 U.S.C. § 2332(b); and Section 2332a(a) provides in relevant part that, "[a] person who ... uses, threatens, or attempts or conspires to use, a weapon of mass destruction ... (1) against a national of the United States while such national is outside of the United States; ... or (3) against any property that is owned, leased or used by the United States ..., whether the property is within or outside of the United States, shall [be punished as further provided]." 18 U.S.C. § 2332a(a).

Odeh suggests that there is but one constitutional grant of authority to legislate that could support these two statutory provisions: Article I, Section 8, Clause 10. *See* Odeh's Memo. at 27–29. Clause 10 grants Congress the authority "[t]o define and punish Piracies and Felonies committed on the high Seas, and Offenses against the Law of Nations." U.S. Const. art. I, § 8, cl. 10. Odeh argues that, as "[t]he acts described in these two statutes ... are not widely regarded as offenses 'against the law of nations,'" these statutes exceed Congress's authority under Clause 10. Odeh's Memo. at 28.

There are two problems with this argument. First, even assuming that the acts described in Section 2332 and 2332a are not *widely* regarded as violations of international law, it does not necessarily follow that these provisions exceed Congress's authority under Clause 10. Clause 10 does not merely give Congress the authority to punish offenses against the law of nations; it also gives Congress the power to "define" such offenses. Hence, provided that the acts in question are recognized by at least some members of the international community as being offenses against the law of nations,[56] Congress arguably has the power to criminalize these acts pursuant to its power *to define* offenses against the law of nations. *See United States v. Smith*, 18 U.S. (5 Wheat.) 153, 159, 5 L.Ed. 57 (1820) (Story, J.) ("Offenses ... against the law of nations, cannot, with any accuracy, be said to be completely ascertained and defined in any public code recognized by the common consent of nations.... [T]herefore ..., there is a peculiar fitness in giving the power to define as well as to punish."); Note, Patrick L. Donnelly, *Extraterritorial Jurisdiction Over Acts of Terrorism Committed Abroad: Omnibus Diplomatic Security and Antiterrorism Act of 1986*, 72 Cornell L.Rev. 599, 611 (1987) ("Congress may define and punish offenses in international law, notwithstand-

---

**56.** And this would appear to be the case. *See* Blakesley, *Extraterritorial Jurisdiction*, at 72, 70 (noting that terrorist violence includes "wanton violence against innocent civilians," and that this offense is "condemned by virtu-

ally all domestic law"); *id.* at 73 ("[A]ll nations condemn, prosecute and punish terrorist violence, when perpetrated against them or their nationals.").

ing a lack of consensus as to the nature of the crime in the United States or in the world community.").

Second, and more important, it is not the case that Clause 10 provides the only basis for Sections 2332 and 2332a. The Supreme Court has recognized that, with regard to foreign affairs legislation, "investment of the federal Government with the powers of external sovereignty did not depend upon the affirmative grants of the Constitution." *United States v. Curtiss–Wright Export Corp.,* 299 U.S. 304, 318, 57 S.Ct. 216, 81 L.Ed. 255 (1936). Rather, Congress's authority to regulate foreign affairs "exist[s] as inherently inseparable from the conception of nationality." *Id.* (citations omitted). More specifically, this "concept of essential sovereignty of a free nation clearly requires the existence and recognition of an inherent power in the state to protect itself from destruction." *United States v. Rodriguez,* 182 F.Supp. 479, 491 (S.D.Cal.1960), *aff'd in part, rev'd in part sub nom Rocha v. United States,* 288 F.2d 545 (9th Cir.), *cert. denied,* 366 U.S. 948, 81 S.Ct. 1902, 6 L.Ed.2d 1241 (1961).

In penalizing extraterritorial conspiracies to kill nationals of the United States, Section 2332(b) is clearly designed to protect a vital United States interest. And, indeed, Congress expressly identified this protective function as the chief purpose of Section 2332. *See* 132 Cong.Rec. S1382–88, § 2331 (1986) (finding that "it is an accepted principle of international law that a country may prosecute crimes committed outside its boundaries that are directed against its own security or the operation of its government functions ... [and] terrorist attacks on Americans abroad threaten a fundamental function of our Government: that of protecting its citizens"); *see also* 132 Cong.Rec. S1057 (1986) (statement of Sen. Specter) (stating that Section 2332 is justified by the protective principle). Similarly, in penalizing attacks on United States property, Section 2332a(a)(3) is clearly designed to protect a vital United States interest. See H.R.Conf.Rep. No. 102–405, at 6 (1991) ("The Congress finds

that the use and threatened use of weapons of mass destruction ... gravely harm the national security and foreign relations interests of the United States ...."). Therefore, we conclude, under *Curtiss–Wright,* that Congress acted within its authority in enacting these provisions.

In view of the foregoing, we deny Odeh's motion to dismiss the counts based on Sections 2332 and 2332a (viz., Counts 1, 4, 9, and 10) insofar as this motion depends on his "lack of constitutional authority" argument.

## IV. The Passive Personality Principle

Odeh argues that (i) because, in enacting Sections 2332 and 2332a, Congress relied *solely* on the passive personality principle of jurisdiction, *see* Odeh's Memo. at 30–31, and (ii) because the United States has "traditional[ly] reject[ed]" this principle, *id.* at 30, the counts based on these statutes should be dismissed.

There are two problems with this argument. First, the argument is a *non sequitur.* Given (i) that Congress clearly had the authority to enact Sections 2332 and 2332a (as established in Section IV above), and (ii) that the passive personality principle is "increasingly accepted as applied to terrorist and other organized attacks on a state's nationals by reason of their nationality, or to assassination of a state's diplomatic representatives or other officials," Restatement § 402, cmt. g; *see also United States v. Rezaq,* 134 F.3d 1121, 1133 (D.C.Cir.), *cert. denied,* 525 U.S. 834, 119 S.Ct. 90, 142 L.Ed.2d 71 (1998) (accepting passive personality principle), it matters not that the United States "traditionally" rejected the principle.

Second, it is simply not the case that Congress predicated Sections 2332 and 2332a solely on the passive personality principle. Rather, as established in Subsection III above, Congress also relied—indeed, relied primarily—on the protective principle.

For the foregoing reasons, we deny Odeh's motion to dismiss the counts based on Sections 2332 and 2332a (viz., Counts 1, 4, 9, and 10) insofar as this motion depends on his "passive personality" argument.

## V. Application of 18 U.S.C. § 930(c) to Foreign Victims

■■■ Odeh argues that interpreting Section 930(c) to reach "the deaths of Kenyan and Tanzanian citizens [as opposed to United States citizens] would be contrary to established principles of international law." Odeh's Memo. at 32. More specifically, Odeh advances the following two arguments. First, given (i) that "[u]nder 18 U.S.C. § 930(c), the only arguable basis for jurisdiction over the deaths of foreign citizens is the principle of universality," (ii) that "[u]niversal jurisdiction results where there is *universal* condemnation of an offense, and a general interest in cooperating to suppress them, as reflected in *widely accepted* international agreements," and (ii) that "the universality principle does not encompass terrorist actions resulting in the deaths of individuals who are not diplomatic personnel," it follows that applying Section 930(c) to the deaths of "ordinary" foreign nationals on foreign soil would constitute a violation of international law. *Id.* at 33 (citations omitted).

There are two problems with this argument. First, because "universal jurisdiction is increasingly accepted for certain acts of terrorism, such as . . . indiscriminate violent assaults on people at large," Restatement § 404, cmt. a, a plausible case could be made that extraterritorial application of Section 930(c) in this case *is* supported by the universality principle.

Second, it is not the case that the universality principle is the "only arguable basis for jurisdiction over the deaths of foreign citizens." As indicated by our conclusion (in Subsection I.B.3 above) that Section 930(c) is designed to *protect* vital United States interests, the protective principle is also an "arguable basis" for the extraterritorial application of Section 930(c). Hence, the only question is whether a statute of general application—the

extraterritorial application of which is acknowledged to be justified by the protective principle—is nevertheless restricted to victims who are citizens of the nation that enacted the statute. We are aware of no authority for this proposition. Nor is such a limitation consistent with the purposes the protective principle is designed to serve. Such a limitation could only weaken the protective function of a statute designed to protect United States interests. In providing for the death penalty where death results in the course of an attack on a Federal facility, Section 930(c) is clearly designed to deter attacks on Federal facilities. Given the likelihood that foreign nationals will be in or near Federal facilities located in foreign nations, this deterrent effect would be significantly diminished if Section 930(c) were limited to the deaths of United States nationals. To paraphrase *Bowman*, "to limit [the reach of Section 930(c) to the deaths of United States nationals] would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for [attacks against Federal facilities]." 260 U.S. at 101.

Odeh argues, second, that, even if the universality principle (or one of the four other principles) did authorize the application of Section 930(c) to the deaths of ordinary foreign nationals on foreign soil, such application would violate international law nevertheless, because (i) "[e]ven where one of the principles authorizes jurisdiction, a nation is nevertheless precluded from exercising jurisdiction where jurisdiction would be 'unreasonable,'" and (ii) application of Section 930(c) to the deaths of ordinary foreign nationals on foreign soil would be unreasonable. *Id.* (citations omitted).

According to the Restatement, the following factors are to be taken into account for the purpose of determining whether exercise of extraterritorial jurisdiction is reasonable:

(a) the link of the activity to the territory of the regulating state, i.e., the extent to which the activity takes place

within the territory, or has substantial, direct, and foreseeable effect upon or in the territory;

(b) the connections, such as nationality, residence, or economic activity, between the regulating state and the person principally responsible for the activity to be regulated, or between that state and those whom the regulation is designed to protect;

(c) the character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which other states regulate such activities, and the degree to which the desirability of such regulation is generally accepted;

(d) the existence of justified expectations that might be protected or hurt by the regulation;

(e) the importance of the regulation to the international political, legal, or economic system;

(f) the extent to which the regulation is consistent with the traditions of the international system;

(g) the extent to which another state may have an interest in regulating the activity; and

(h) the likelihood of conflict with regulation by another state.

Restatement § 403(2). Given that factor (a) alludes to the subjective territorial principle and the objective territorial principle, it is not especially relevant to a statute, such as Section 930(c), based primarily on the protective principle. Much the same can be said of factor (b), as it alludes to the nationality principle, the subjective territorial principle, and the objective territorial principle.[57] Factor (c), in contrast, is highly relevant to Section 930(c). It is important both to the United States and other nations to prevent the destruction of their facilities—regardless of their location; and such regulation is accordingly widely accepted among the nations of the world.[58] As for factor (d), Section 930(c) protects the expectation of foreign nationals that they will be free of harm while on the premises of United States facilities. We can think of no "justified" expectation, however, that would be hurt by the extraterritorial application of Section 930(c).[59] As for factor (e), in light of the prominent role played by the United States in "the international political, legal, and economic systems," the protection of United States facilities—regardless of their location—is highly important to the stability of these systems. Turning to factor (f), as indicated by the preceding discussion of factor (c), most, if not all, nations are concerned about protecting their facilities, both at home and abroad. Hence, Section 930(c) is highly consistent "with the traditions of the international system." As for (g), it must be acknowledged that when the United States facility is on foreign soil, and when the victims of the attack are nationals of the host nation, the host nation "has a keen interest in regulating and punishing [the] offenders." Odeh's Memo. at 34. This is not to say, however, that the host nation has a greater interest than does the United States. Furthermore, even if it were the case that the host nation had a greater interest than the United States, this single factor would be insufficient to support the conclusion that application of Section 930(c) to the bombings of the two Embassies is unreasonable. Coming, finally, to factor (h), Odeh does not argue that application of Section 930(c) to the bombings would con-

---

**57.** This said, it is likely that many of the foreign nationals killed in the embassy bombing had significant connections to the United States. For example, some probably were embassy employees, while others were at the embassy conducting business of various kinds with the United States.

**58.** *See* Blakesley, *Extraterritorial Jurisdiction,* at 73 ("[A]ll nations condemn, prosecute and punish terrorist violence, when perpetrated against them or their nationals.").

**59.** Even if it were the case that foreign nationals did not expect Section 930(c) to apply to the destruction of United States facilities on foreign soil—and, as noted in Subsection II.B above, we doubt that this is the case—such an expectation is not "justified."

flict with Kenyan and/or Tanzanian law, nor are we otherwise aware of such conflict. On the contrary, the Government informs the Court that "[t]he Kenyan Government voluntarily rendered Odeh (and [co-defendant] al-'Owhali) to the United States, and neither the Kenyan nor the Tanzanian Government has asserted any objection to the United States' exercise of jurisdiction in this case." Gov't Memo. at 33. Factor (h) thus counts in favor of the reasonableness of applying Section 930(c) to the bombings.

In light of the foregoing, we conclude that the application of Section 930(c) to the deaths of foreign nationals on foreign soil is reasonable. We therefore deny Odeh's motion to dismiss the counts predicated on Section 930(c) (viz., Counts 11–233) insofar as this motion depends on the arguments discussed in this Subsection.

## VI. The Death Penalty and International Law

Noting that "the Government has indicated that it will seek the death penalty" for his alleged crimes, Odeh argues that, "[b]ecause the imposition of the death penalty would be contrary to international law on the facts of this case, the Court should dismiss counts 7–239." Odeh's Memo. at 35.[60]

Because "the Government has not determined against which defendants, if any, it will seek the death penalty," we agree with the Government's contention that this argument is premature. Gov't Memo. at 43. Therefore, we decline to consider it at this time. For the same reason, we grant Odeh's request for "an opportunity to revisit ... arguments [against the death penalty based on international law] should the Government ... seek the death penalty." Odeh's Reply Memo. at 20.

**60.** Counts 7–239 are the counts predicated on statutes that provide for the death penalty.

**61.** In saying this we do not mean to contest Odeh's suggestion that courts should be particularly sensitive to the presence of ambiguity in statutes "implicating the death penalty," Odeh's Memo. at 21 (*citing State v. Harrell,*

One final issue remains. Apparently alluding to the Government's contention that Odeh's death penalty argument is premature, Odeh states that "[t]he Government argues that *all* arguments relating to the death penalty are premature, since the Government has not yet decided whether to seek authorization for the death penalty." Odeh's Reply Memo. at 19 (emphasis added). This statement is false. The Government argues ripeness only in regard to Odeh's sixth argument. In any case, Odeh then proceeds to make the following ambiguous request:

> [T]he Court cannot decide the questions of constitutional and statutory interpretation raised here without considering that this is potentially a capital prosecution. If the Court agrees that these arguments are premature, Odeh respectfully requests that the Court withhold a final ruling on the questions raised in his memoranda, at least as regards the death-eligible offenses.

*Id.* This request is ambiguous because it is not clear to which arguments Odeh is referring. Odeh may be referring narrowly to his due process arguments, or broadly to all of his arguments. Given that only his due process arguments qualify as "arguments relating to the death penalty," we assume that Odeh is referring only to those arguments.

As noted, the Government does *not* contend that *those* arguments are premature, and we agree that they are not. To consider first the rule of lenity argument, having concluded that Sections 844, 924, 930, 1114, 1116, 2155, and 2332a unambiguously apply to the extraterritorial conduct of foreign nationals, it is simply irrelevant (to a determination of whether the rule of lenity should be applied) that these statutes provide for the death penalty.[61]

238 Conn. 828, 681 A.2d, 944, 947 (1996)), i.e., as opposed to statutes providing for lesser punishments. Our point is merely that once it is determined that such a death-implicating statute is unambiguous, the court has no greater reason to construe it in favor of the defendant than it has to construe an unambig-

Turning to the fair warning argument, Odeh suggests that this argument "relates" to the death penalty when he says that the question is whether "a reasonable foreign citizen would have known he risked a *death sentence* for his actions." Odeh's Memo. at 27 (emphasis added). This formulation of the issue is misleading, however. Given that the availability of the death penalty is clearly and explicitly specified in each of the statutes referred to by Odeh (viz., Sections 844, 924, 930, and 2155), the real question as regards these statutes is whether a reasonable foreign citizen would have known that he risked being prosecuted in the United States for performing the actions proscribed by these statutes, e.g., blowing up United States embassies. Hence, the Government's ultimate decision to seek or not to seek the death penalty pursuant to these statutes has no bearing whatever on the question whether Odeh had fair warning.

This brings us, finally, to Odeh's sufficient nexus argument. Odeh contends that, "[e]ven assuming, *arguendo,* that Odeh's alleged involvement in a conspiracy to kill Americans established sufficient nexus for a non-capital prosecution, the Court should require a far greater nexus before permitting the United States Government to seek the execution of a foreign citizen." Odeh's Reply Memo. at 19. Unfortunately, however, Odeh provides no support for this contention whatsoever. Nor does any such support appear to be available. If Odeh's alleged involvement in a conspiracy to kill Americans does indeed satisfy the nexus requirement, then we fail to see how his eligibility for the death penalty if convicted of this offense could sever this nexus.

### Conclusion

In light of the foregoing, Odeh's motion to dismiss Counts 5–233, 236–239, and 242–244 for lack of jurisdiction is denied; whereas, his motion to dismiss Counts 234,

uous non-death-implicating statute in favor of

235, 240, and 241 for lack of jurisdiction is granted.

SO ORDERED